******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* MICHAEL GIANNONE
## (AC 46008)

Bright, C. J., and Clark and Seeley, Js.

*Syllabus*

The defendant appealed from the judgments of the trial court following his convictions of several weapons related charges. He claimed that the trial court improperly denied his motions to dismiss and to suppress because it had incorrectly determined that the applicable statutes (§§ 53-202b, 53-202w and 53a-211) did not violate his second amendment right to bear arms. *Held*:

The trial court applied an incorrect legal standard in denying the defendant's motions to dismiss and to suppress; accordingly, this court reversed the judgments and remanded the cases to the trial court for reconsideration of the defendant's motions under the standard announced in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen* (597 U.S. 1).

In adjudicating the defendant's as applied constitutional challenge on remand, the trial court was directed to apply the text and history test set forth in *Bruen*, under which the defendant bears the initial burden to show that the plain text of the second amendment presumptively protects his right to keep and bear the items at issue.

This court directed that, if the trial court finds that the second amendment presumptively protects the defendant's conduct, the state then bears the burden to establish the constitutionality of the statutes at issue through historical analogues of firearm regulation that imposed a comparable burden that is comparably justified.

Argued March 4—officially released September 17, 2024

*Procedural History*

Substitute information, in the first case, charging the defendant with two counts each of the crimes of sale of an assault weapon, possession of an assault weapon and possession of a large capacity magazine, and with one count of the crime of firearms trafficking, and substitute information, in the second case, charging the defendant with sixty-five counts of the crime of possession of a large capacity magazine, nine counts of the crime of possession of an assault weapon, three counts of the crime of possession of a silencer and one count each of the crimes of improper storage of firearms, risk

of injury to a child and possession of a weapon on school grounds, brought to the Superior Court in the judicial district of Danbury, where the court, *Pavia, J.*, denied the defendant's motions to dismiss and to suppress certain evidence; thereafter, the defendant was presented to the court, *D'Andrea, J.*, on conditional pleas of nolo contendere to two counts each of sale of an assault weapon, possession of a silencer and possession of a large capacity magazine; judgments of guilty in accordance with the pleas; subsequently, the state entered a nolle prosequi in each case as to the remaining charges, and the defendant appealed to this court. *Reversed*; *further proceedings*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Melissa E. Patterson*, senior assistant state's attorney, with whom, on the brief, were *David R. Applegate*, state's attorney, and *Matthew Knopf*, assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Michael Giannone, appeals from the judgments of conviction rendered by the trial court following his conditional pleas of nolo contendere to two counts each of sale of an assault weapon in violation of General Statutes § 53-202b (a) (1), possession of a silencer in violation of General Statutes § 53a-211, and possession of a large capacity magazine in violation of General Statutes § 53-202w (c) (2). On appeal, the defendant claims that the court improperly denied his motion to dismiss the charges against him and his motion to suppress evidence seized by the police because the statutes under which he was convicted violate his right to bear arms under the second amendment to the United States constitution.[1] In

---

[1] In his principal brief on appeal, the defendant phrases the sole issue as whether his convictions violate the second amendment. The issue is more properly stated as whether the trial court improperly denied his motion to dismiss and motion to suppress because, pursuant to General Statutes § 54-

light of the United States Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), which was issued after the trial court denied the defendant's motions but prior to his sentencing, we conclude that the judgments of the trial court must be reversed and the cases remanded for an evidentiary hearing on the defendant's motions. In addition, we provide guidance to the trial court regarding how it should analyze the claims raised in the defendant's motions under *Bruen*.

The following undisputed facts and procedural history are relevant to the present appeal. In March, 2016, a confidential source informed the state police that the defendant was selling AR-15 style rifles[2] without serial numbers and without proper documentation. An undercover detective subsequently conducted two controlled firearm purchases from the defendant at the defendant's residence in New Fairfield during the weeks of March 13

94a, those are the only issues that this court may consider on appeal. See footnote 10 of this opinion.

Additionally, we note that, although the defendant filed memoranda of law in support of both motions, his memorandum of law in support of the motion to suppress simply restated the basis for his motion to suppress and adopted the memorandum of law in support of the motion to dismiss. Furthermore, the trial court addressed these motions together, with the heading of the court's memorandum of decision stating that it pertains to the "motion to suppress/dismiss." Because the parties' arguments and the court's analysis of the defendant's second amendment claims are the same as to both motions, we address the defendant's claim on appeal as pertaining to both motions.

[2] The United States Supreme Court has described the AR-15 as "the civilian version of the military's M-16 rifle," noting that, "unless modified, [it is] a semiautomatic weapon." *Staples* v. *United States*, 511 U.S. 600, 603, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994); see also *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 70, 202 A.3d 262 ("the AR-15 assault rifle . . . is substantially similar to the standard issue [M-16] military service rifle . . . but fires only in semiautomatic mode"), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*,      U.S.      , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

and 20, 2016. During the first transaction, the detective purchased from the defendant an AR-15 style semiautomatic .223 caliber assault rifle with a pistol grip, collapsible stock, and flash suppressor, bearing no serial number, and a thirty round large capacity magazine in exchange for $800. During the second transaction, the undercover detective purchased from the defendant another AR-15 style semiautomatic .223 caliber assault rifle with a pistol grip, collapsible stock, flash suppressor, and approximately 10.5 inch barrel, also bearing no serial number, and another thirty round large capacity magazine in exchange for $800. No paperwork was completed or transferred regarding either sale. In connection with these two transactions, in Docket No. CR-16-153002-S, the state charged the defendant in a March 23, 2016 information with, inter alia, two counts of sale of an assault weapon in violation of § 53-202b (a) (1).[3] As a result of the seizure by the police of various firearm related items while executing a search warrant at the defendant's residence, the state also charged the defendant in a June 14, 2016 substitute information in Docket No. CR-16-0153519-S with, inter alia, three counts of possession of a silencer in violation of § 53a-211[4] and sixty-five counts of possession of a large capacity magazine in violation of § 53-202w (c) (2).[5]

---

[3] General Statutes § 53-202b (a) (1) provides: "Any person who, within this state, distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, or who gives any assault weapon, except as provided by sections 53-202a to 53-202k, inclusive, shall be guilty of a class C felony and shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced by the court."

Pursuant to General Statutes § 53-202a (1) (B) (xx), "assault weapon" includes, among others, AR-15 "semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles . . . ."

[4] General Statutes § 53a-211 provides in relevant part: "(a) A person is guilty of possession of . . . a silencer when he owns, controls or possesses . . . any silencer designed to muffle the noise of a firearm during discharge. . . ."

[5] General Statutes § 53-202w provides in relevant part: "(c) Except as provided in this section and section 53-202x . . . (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after April 5, 2013, shall be guilty of a class D felony. . . ."

On January 2, 2019, the defendant filed a motion to dismiss the charges against him and a motion to suppress the seized evidence. He filed memoranda of law in support of both motions, in which he argued that the statutes under which he was charged violate his right to bear arms under the second amendment to the United States constitution and article first, § 15, of the Connecticut constitution. The state filed a memorandum of law in opposition to the defendant's motions on February 4, 2019. Without a hearing,[6] the court, *Pavia, J.*, subsequently denied the defendant's motions in a June 12, 2019 memorandum of decision,[7] concluding that the statutes at issue did not unconstitutionally infringe on the defendant's right to bear arms as guaranteed by the state and federal constitutions. In reaching that conclusion, the court applied the pre-*Bruen* two step approach that the United States Court of Appeals for the Second Circuit and several other federal circuit courts adopted following the United States Supreme Court's decisions in *District of Columbia* v. *Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), and *McDonald* v. *Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). See *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 804 F.3d 242, 253–54 (2d Cir. 2015), cert. denied sub nom. *Shew* v. *Malloy*, 579 U.S.

---

[6] During a court proceeding on January 10, 2019, after setting a deadline for the state to file a response to the defendant's motions, the court noted that it was "probably [going to] need [to hold] a hearing" on those motions. The following colloquy then occurred between the court and the prosecutor:

"[The Prosecutor]: I don't think it's an evidentiary, I think it's just more—

"The Court: More of an argument—

"[The Prosecutor]: —you can take on the papers. Yes.

"The Court: —okay."

Defense counsel did not argue that an evidentiary hearing was necessary. Moreover, there is no indication in the record, including in the court's memorandum of decision, that the court held a hearing at which evidence or argument was presented on the defendant's motions.

[7] Although the court indicated in its memorandum of decision that the motion to suppress "is addressed in a separate ruling," there is no separate ruling in the record. See footnote 1 of this opinion.

917, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016). That two step framework required a court first to assess whether the challenged statute burdened conduct protected by the second amendment. Id., 254. If the first step was satisfied, the court would move to the second step of the inquiry, at which it would "[evaluate] the law under some form of means-end scrutiny. If the law passe[d] muster under that standard, it [was] constitutional. If it fail[ed], it [was] invalid." (Internal quotation marks omitted.) *State* v. *DeCiccio*, 315 Conn. 79, 111, 105 A.3d 165 (2014). In *DeCiccio*, our Supreme Court concluded that intermediate scrutiny applied in the second amendment context; id., 142; which required the state to "demonstrate that the [firearms regulation at issue] [was] substantially related to an important government objective."[8] (Internal quotation marks omitted.) Id., 143.

In the present cases, the trial court's analysis focused almost exclusively on the second step of the pre-*Bruen* test. Applying the intermediate scrutiny means-end test

---

[8] The United States Supreme Court acknowledged in *Bruen* that "[s]tep one of the predominant framework [was] broadly consistent with *Heller*"; *New York State Rifle & Pistol Assn.*, *Inc.* v. *Bruen*, supra, 597 U.S. 19; and that its decision in *Bruen* was merely applying the text and history test set forth in *Heller*. See id., 26. Therefore, as other courts have recognized, pre-*Bruen* decisions applying *Heller* have at least some relevance following *Bruen* to the extent that they are consistent with the text and history test established in *Heller* and clarified in *Bruen*. See, e.g., *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 8 (D.D.C. 2023) (*Bruen*'s "first step is consistent with the first step of [c]ourts of [a]ppeals' decisions pre-*Bruen*. In other words, *Bruen* did not disturb the analysis [c]ourts of [a]ppeals conducted under the first step of their framework. . . . The [c]ourt will therefore . . . accord [the step one] analysis [in those pre-*Bruen* cases] persuasive weight to the extent they are instructive." (Citation omitted.)), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061); see also *United States* v. *Kirby*, Docket No. 3:22-cr-26-TJC-LLL, 2023 WL 1781685, *1 (M.D. Fla. February 6, 2023) ("*Bruen*, despite changing the [s]econd [a]mendment landscape, did not overrule *Heller*"), aff'd, Docket No. 24-10142, 2024 WL 2846679 (11th Cir. June 5, 2024), petition for cert. filed (U.S. September 4, 2024) (No. 24-5453). Accordingly, we rely on pre-*Bruen* case law such as *DeCiccio* in this opinion to the extent that we find that it is consistent with *Bruen*.

pursuant to *DeCiccio*, the court stated: "While the defendant enjoys the protection of his second amendment right to bear arms, this right is not unfettered. . . . [T]he constitution does not confer a right to possess any and all weapons unconstrained by restriction. The government has a critical interest in the protection of its citizens to live freely from the threats of violence and destruction. See *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, supra, [804 F.3d 261] (government has substantial, indeed compelling, governmental interests in public safety and crime prevention). This court must therefore evaluate whether the challenged statutes in the present cases bear a substantial relationship to the achievement of this governmental objective. It is important to note that none of the charged offenses bar the defendant from enjoying his constitutionally protected second amendment rights. The defendant has a legal means to avail himself of his right to bear arms. See *Benjamin* v. *Bailey*, 234 Conn. 455, 471, [662 A.2d 1226] (1995) (a statutory ban on assault weapons does not impair the right to bear arms, as it continues to permit access to a wide array of weapons). The government, however, has an interest in the protection of society, and this interest is substantially furthered by reducing access to, and in restricting the transfer of, assault weapons and large capacity magazines. [Id., 467.] (courts have overwhelmingly recognized that the right to bear arms is not infringed by reasonable regulation by the state in the exercise of its police power to protect the health, safety and morals of the citizenry). This stands particularly true in weapons that are void of any traceable and identifying markings. As such, the court finds that the statutes in question in the present matter do not infringe upon the defendant's right to bear arms as guaranteed by the United States and Connecticut constitutions." (Footnote omitted; internal quotation marks omitted.)

Following the court's denial of the defendant's motions to dismiss and to suppress, the state filed a substitute information in Docket No. CR-16-0153002-S on May 3, 2022, charging him with, inter alia, two counts each of sale of an assault weapon and possession of a large capacity magazine. The defendant thereafter entered pleas of nolo contendere to two counts of sale of an assault weapon, two counts of possession of a silencer,[9] and two counts of possession of a large capacity magazine, conditioned on his right to appeal from the court's rulings on his motion to dismiss and motion to suppress. See General Statutes § 54-94a.[10] After the court ruled on the defendant's motions, but prior to his sentencing, the United States Supreme Court issued its decision in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 1. In *Bruen*, the Supreme

[9] The trial court record inconsistently describes the silencer charge. For instance, the judgments of the trial court, *D'Andrea, J.*, setting forth the defendant's sentences describe the offense both as "possession of sawed off shotgun/silencer in violation of . . . § 53a-211" and "possession of a silencer in violation of . . . § 53a-211," which statute prohibits the possession of both silencers and sawed-off shotguns. We also observe that Judge Pavia's memorandum of decision denying the defendant's motions to dismiss and to suppress notes that "[t]he defendant stands charged with the crimes of firearms trafficking, illegal sale of an assault weapon, illegal possession of an assault weapon, illegal possession of a large capacity magazine, [and] possession of a sawed-off shotgun" but not that the defendant was charged with the crime of possession of a silencer. The substitute information that the state filed in Docket No. CR-16-0153519-S, however, describes the relevant charge as "possession of a silencer (three counts)" in violation of § 53a-211. We rely on the information as an accurate statement of the charges against the defendant.

[10] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. . . ." See also Practice Book § 61-6 (a) (2) (A) (same).

Court expressly rejected the Second Circuit's two step framework, which the trial court applied in the present cases. See id., 19. The Supreme Court, instead, clarified and applied "*Heller*'s text-and-history standard"; id., 39; which the court emphasized did not involve the means-end balancing that the trial court had applied in the present cases. See id., 19.

Despite the Supreme Court's decision in *Bruen*, the defendant did not ask the trial court to reconsider his motions to suppress and to dismiss. Accordingly, on September 2, 2022, the court, *D'Andrea, J.*, sentenced the defendant to a total effective term of ten years of incarceration, execution suspended after three years, with five years of probation.[11] This appeal followed.

I

On appeal, the defendant claims that the Supreme Court's decision in *Bruen* "has revolutionized courts' analysis of firearms laws." The defendant argues that the proper application of the *Bruen* analysis in the present cases leads to the conclusion that the statutes under which the defendant was convicted are unconstitutional as applied to him,[12] and his convictions therefore must be vacated. The state acknowledges that

[11] Specifically, the trial court sentenced the defendant as follows: (1) on each of the two counts of sale of an assault weapon, ten years of incarceration, execution suspended after three years, with five years of probation with special conditions, and deadly weapon offender registration; (2) on each of the two counts of possession of a silencer, five years of incarceration, execution suspended after three years, with five years of probation with special conditions, and deadly weapon offender registration; and (3) on each of the two counts of illegal possession of a large capacity magazine, five years of incarceration, execution suspended after three years, with five years of probation with special conditions and deadly weapon offender registration. The sentences were to run concurrently with each other for a total effective sentence of ten years of incarceration, execution suspended after three years, two of which were a mandatory minimum. The state entered a nolle prosequi as to all remaining counts.

[12] During oral argument before this court, the state argued that the defendant's claims were facial challenges to the statutes at issue. We do not construe his claims that way. Although, in his principal and reply briefs on

*Bruen* explicitly rejected the means-end analysis that the trial court had applied in the present cases but argues that *Bruen* did not materially alter the manner in which courts apply the second amendment to restrictions on certain types of weapons. Consequently, the state argues that the trial court correctly concluded that the statutes under which the defendant was convicted are constitutional.

To provide context for our analysis of *Bruen*'s impact on the present dispute, we begin with a review of the development of second amendment law, starting with the United States Supreme Court's seminal decision in

appeal, the defendant refers to the regulated firearms generally as "assault weapons" or "semiautomatic rifles," suggesting that his challenge to General Statutes § 53-202a may not be limited to the prohibition on the sale of the particular AR-15 style rifles at issue in the present cases, the defendant does not argue that the statutes at issue are unconstitutional as applied to each of the specific firearms enumerated in those statutes. See General Statutes § 53a-211 (banning, in addition to silencers, sawed-off shotguns) and General Statutes § 53-202a (enumerating various types of assault weapons, including both semiautomatic *and* fully automatic firearms, including, but not limited to, AR-15s, that fall within statutory definition of "assault weapon"). Such a showing is required to prevail on a facial challenge under *Bruen*. See *United States* v. *Rahimi*, U.S. , 144 S. Ct. 1889, 1898, 219 L. Ed. 2d 351 (2024) (facial challenge "requires a defendant to establish that *no set of circumstances* exists under which the [statute] would be valid" (emphasis added; internal quotation marks omitted)); see also *National Assn. for Gun Rights* v. *Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023) (plaintiffs raising facial challenge to assault weapon ban on "*specific* firearms of enumerated models and features," as opposed to a complete ban on "all semiautomatic rifles, or . . . semiautomatic handguns," had burden "to present evidence regarding the *specific* assault weapons enumerated in the [c]hallenged [s]tatutes" (emphasis in original)). Moreover, the defendant's counsel indicated during oral argument before this court that each of his claims "could be" and "probably [are]" as applied challenges. Consequently, we construe the defendant's claim as to each statute to be that it is unconstitutional as applied to the particular facts of his cases. We do not, however, intend to preclude the defendant from arguing on remand that the statutes are unconstitutional on their face, in which case he will bear a much heavier burden. See *United States* v. *Rahimi*, supra, 1898 (facial challenge is "most difficult challenge to mount successfully" (internal quotation marks omitted)).

*District of Columbia* v. *Heller*, supra, 554 U.S. 570. "In *Heller*, the United States Supreme Court was called on to determine the constitutionality of District of Columbia ordinances that broadly prohibited the possession of handguns, in the home and elsewhere; see id., 574–76; and also required citizens to 'keep their lawfully owned firearms, such as registered long guns, "unloaded and disassembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities.' Id., 575. In determining whether the second amendment confers an individual right to possess arms and, if so, the scope of such a right, the court conducted an extensive textual and historical analysis of the second amendment, which provides: 'A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.' U.S. Const., amend. II." (Footnote omitted.) *State* v. *DeCiccio*, supra, 315 Conn. 108–109. As to the meaning of "[a]rms" in the second amendment, the court in *Heller* stated that "[t]he 18th-century meaning is no different from the meaning today." *District of Columbia* v. *Heller*, supra, 581. The court referenced both a 1773 dictionary, which defined "arms" as "[w]eapons of offence, or armour of defence," and a 1771 legal dictionary, which defined that term as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." (Internal quotation marks omitted.) Id.

In *DeCiccio*, our Supreme Court stated: "Upon examining the prefatory and operative clauses of the second amendment; see generally *District of Columbia* v. *Heller*, supra, [554 U.S. 577–600]; the court [in *Heller*] concluded that it 'guarantee[s] the individual right to possess and carry weapons in case of confrontation.'[13]

---

[13] "The court emphasized that its reading of the operative clause in this manner was consistent with the prefatory clause, observing that: 'It is therefore entirely sensible that the [s]econd [a]mendment's prefatory clause

Id., 592. The court observed, however, that this right is 'not unlimited, just as the [f]irst [a]mendment's right of free speech [is] not . . . . Thus, [the court] do[es] not read the [s]econd [a]mendment to protect the right of citizens to carry arms for any sort of confrontation, just as [the court] do[es] not read the [f]irst [a]mendment to protect the right of citizens to speak for any purpose.' . . . Id., 595. After considering the parameters of the second amendment right, the court held that it does protect the possession of 'weapons . . . typically possessed by law-abiding citizens for lawful purposes'; id., 625; and does not protect 'dangerous and unusual weapons.' . . . Id., 627. The court further concluded that the District of Columbia's firearms ordinances violated 'the inherent right of self-defense [that] has been central to the [s]econd [a]mendment right. The handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family . . . would fail constitutional muster.' . . . Id., 628–29.

"Two years later, the United States Supreme Court considered whether the second amendment right to keep and bear arms is incorporated in the concept of

announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new [f]ederal [g]overnment would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written [c]onstitution.' *District of Columbia* v. *Heller*, supra, 554 U.S. 599." *State* v. *DeCiccio*, supra, 315 Conn. 109 n.21.

due process and, therefore, applicable to the states via the fourteenth amendment. See *McDonald* v. *Chicago*, supra, 561 U.S. 750. The court in *McDonald* explained that its 'decision in *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and, in *Heller*, [the court] held that individual self-defense is the central component of the [s]econd [a]mendment right.' . . . Id., 767. Following a detailed historical analysis; see generally id., 768–77; the court concluded that the second amendment is applicable to the states because 'the [f]ramers and ratifiers of the [f]ourteenth [a]mendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.' Id., 778." (Footnote in original.) *State* v. *DeCiccio*, supra, 315 Conn. 109–11.

Then came *Bruen*. Nearly fifteen years after *Heller* was decided, the United States Supreme Court considered a challenge to a New York statute that required a handgun owner to demonstrate " 'proper cause' " to acquire a permit to carry a handgun in public. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 12. The court began its analysis by summarizing its prior holdings and how those holdings had been applied: "In *Heller* and *McDonald*, we held that the [s]econd and [f]ourteenth [a]mendments protect an individual right to keep and bear arms for self-defense. In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home. In the years since, the [c]ourts of [a]ppeals have coalesced around a two-step framework for analyzing [s]econd [a]mendment challenges that combines history with means-end scrutiny. . . .

"At the first step, the government may justify its regulation by establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood. E.g., *Kanter* v. *Barr*, 919 F.3d 437, 441 (7th

Cir. 2019) . . . . But see *United States* v. *Boyd*, 999 F.3d 171, 185 (3d Cir. 2021) (requiring claimant to show a burden on conduct falling within the scope of the [s]econd [a]mendment's guarantee). The [c]ourts of [a]ppeals then ascertain the original scope of the right based on its historical meaning. . . . If the government can prove that the regulated conduct falls beyond the [a]mendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected. . . . But if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two. . . .

"At the second step, courts often analyze how close the law comes to the core of the [s]econd [a]mendment right and the severity of the law's burden on that right. . . . The [c]ourts of [a]ppeals generally maintain that the core [s]econd [a]mendment right is limited to self-defense *in the home.* . . . If a core [s]econd [a]mendment right is burdened, courts apply strict scrutiny and ask whether the [g]overnment can prove that the law is narrowly tailored to achieve a compelling governmental interest. . . . Otherwise, they apply intermediate scrutiny and consider whether the [g]overnment can show that the regulation is substantially related to the achievement of an important governmental interest." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 17–19.

The court in *Bruen* then concluded that "*Heller* and *McDonald* do not support applying means-end scrutiny in the [s]econd [a]mendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id., 19. The court held "that when the [s]econd [a]mendment's

plain text covers an individual's conduct, the [c]onstitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this [n]ation's historical tradition of firearm regulation. *Only if* a firearm regulation is consistent with this [n]ation's historical tradition may a court conclude that the individual's conduct falls outside the [s]econd [a]mendment's unqualified command." (Emphasis added; internal quotation marks omitted.) Id., 17. In *Bruen*, the court emphasized that it was doing no more than applying *Heller*'s "straightforward historical inquiry" to New York's proper cause requirement. Id., 27. Thus, "[f]ollowing the course charted by *Heller*, [the court] consider[ed] whether historical precedent from before, during, and even after the founding evince[d] a comparable tradition of regulation." (Internal quotation marks omitted.) Id.

The court recognized, though, that before considering whether a particular regulation falls within the nation's historical tradition, it first had to determine whether the second amendment's plain text covered the individual's conduct. The conduct in *Bruen* was "carrying handguns publicly for self-defense." Id., 32. Again, the court relied on *Heller* as its lodestar to guide its analysis: "We have already recognized in *Heller* at least one way in which the [s]econd [a]mendment's historically fixed meaning applies to new circumstances: Its reference to arms does not apply only [to] those arms in existence in the 18th century. [*District of Columbia* v. *Heller*, supra, 554 U.S. 582]. Just as the [f]irst [a]mendment protects modern forms of communications, and the [f]ourth [a]mendment applies to modern forms of search, the [s]econd [a]mendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

[Id.] . . . Thus, even though the [s]econd [a]mendment's definition of arms is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." (Internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* supra, 597 U.S. 28. The court further explained that, in *Heller,* "[a]fter holding that the [s]econd [a]mendment protected an individual right to armed self-defense, we also relied on the historical understanding of the [a]mendment to demark the limits on the exercise of that right. We noted that, [l]ike most rights, the right secured by the [s]econd [a]mendment is not unlimited. [*District of Columbia* v. *Heller,* supra, 626.] From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. [Id.] For example, we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the [s]econd [a]mendment protects the possession and use of weapons that are in common use at the time. [Id., 627] . . . ." (Internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* supra, 21.

In *Heller* and *Bruen,* the court easily concluded that handguns were arms within the meaning of the second amendment. As the court stated in *Heller,* "the inherent right of self-defense has been central to the [s]econd [a]mendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *District of Columbia* v. *Heller,* supra, 554 U.S. 628; see also *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* supra, 597 U.S. 31–32 ("[i]t [was] undisputed . . . that handguns are weapons in common use today

for self-defense," and court had "little difficulty concluding that" second amendment's plain text protects right to carry handguns publicly for self-defense (internal quotation marks omitted)).

Having concluded in *Heller* and *Bruen* that the plain text of the second amendment protects the right to keep and bear handguns for self-defense, the court then, in each case, assessed whether there were any analogous historical regulations that justified the handgun regulation at issue. In *Bruen*, in an effort to make "the constitutional standard endorsed in *Heller* more explicit"; *New York State Rifle & Pistol Assn.*, *Inc.* v. *Bruen*, supra, 597 U.S. 31; the court explained the process as follows: "Much like we use history to determine which modern arms are protected by the [s]econd [a]mendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy— a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar. . . . And because [e]verything is similar in infinite ways to everything else . . . one needs some metric enabling the analogizer to assess which similarities are important and which are not . . . . For instance, a green truck and a green hat are relevantly similar if one's metric is things that are green. . . . They are not relevantly similar if the applicable metric is things you can wear.

"While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the [s]econd [a]mendment, we do think that *Heller* and *McDonald* point toward at least two metrics:

how and why the regulations burden a law-abiding citizen's right to armed self-defense." (Citations omitted; internal quotation marks omitted.) Id., 28–29. The court then looked to the history of public carry regulations from the late 1200s to the early 1900s. See id., 34. The court cautioned, however, that "[h]istorical evidence that long predates either [the adoption of the second amendment in 1791 or of the fourteenth amendment in 1868] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. . . . Similarly, we must also guard against giving postenactment history more weight than it can rightly bear. . . . [T]o the extent later history contradicts what the text says, the text controls."[14] (Citations omitted.) Id., 34–36.

After a "long journey through the Anglo-American history of public carry," the court in *Bruen* concluded that the "respondents [had] not met their burden to identify an American tradition justifying the [s]tate's proper-cause requirement. . . . Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." (Citation omitted; internal quotation marks omitted.) Id., 70. The court consequently held that "New York's proper-cause requirement violates the [f]ourteenth [a]mendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." Id., 71.

---

[14] The court in *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the [f]ourteenth [a]mendment was ratified in 1868 when defining its scope (as well as the scope of the right against the [f]ederal [g]overnment)." *New York State Rifle & Pistol Assn., Inc.* v.

Recently, the United States Supreme Court again addressed the scope of the second amendment in *United States* v. *Rahimi*, U.S. , 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024), in which it provided some clarification of the *Bruen* test. *Rahimi* involved a second amendment challenge to "[a] federal statute [that] prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he represents a credible threat to the physical safety of [an] intimate partner, or a child of the partner or individual." (Internal quotation marks omitted.) Id., 1894. An eight person majority of the court, after considering regulations on the possession of weapons by those who pose a threat to others "[f]rom the earliest days of the common law"; id., 1899; to the early 1800s, had "no trouble concluding that [the statute] survive[d] [the defendant's] facial challenge. Our tradition of firearm regulation allows the [g]overnment to disarm individuals who present a credible threat to the physical safety of others. [The statute] can be applied lawfully to [the defendant]." Id., 1902. In reaching this conclusion, the court in *Rahimi* explained that, "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster." (Internal quotation marks omitted.) Id., 1898.

Accordingly, under *Bruen*, a court asks first whether the second amendment's plain text covers the conduct at issue. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 32. If so, that conduct is presumptively protected, and the court proceeds to the second step, at which it asks whether the government has satis-

*Bruen*, supra, 597 U.S. 37. The court did not settle that issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." Id., 38.

fied its burden to identify a historical tradition justifying its firearm regulation.[15] Id., 33–34.

Having set forth the test that the court applied in *Bruen* and having provided historical context for the recent developments in second amendment law, we turn to the test that the trial court applied in the present cases when it decided the defendant's motions to dismiss and to suppress. As previously noted in this opinion, the court applied the then prevailing two step approach adopted by the Second Circuit, following *Heller*, to assess the defendant's second amendment claims and concluded that his claims failed under the type of means-end balancing test that the Supreme Court recently rejected in *Bruen*. The court in the present cases therefore, through no fault of its own, did not apply the correct legal standard when assessing the merits of the second amendment claims raised in the defendant's motions. Additionally, the court did not hold a hearing on the defendant's motions and, therefore, did not make any factual findings that, as we will explain, are necessary to apply the *Bruen* test. See footnote 6 of this opinion. Accordingly, the record is

[15] In *Bruen*, the court stated that the two step analytical framework that many courts applied following *Heller* was "one step too many," implying that the *Bruen* test does not have two separate steps. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 19. Post-*Bruen*, courts have nonetheless interpreted the text and history test applied in *Bruen* as a two step approach that asks, first, whether the second amendment's plain text protects the proposed conduct and, second, whether the regulation is nonetheless consistent with the historical tradition of firearms regulation. See, e.g., *Bevis* v. *Naperville*, 85 F.4th 1175, 1191 (7th Cir. 2023), cert. denied sub nom. *Harrel* v. *Raoul*,    U.S.   , 144 S. Ct. 2491,    L. Ed. 2d    (2024); *United States* v. *Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *United States* v. *Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), rev'd on other grounds,    U.S.   , 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024); see also *United States* v. *Rahimi*, supra, 144 S. Ct. 1928 (Jackson, J., concurring) (observing that *Bruen* rejected pre-*Bruen* "two-step approach as having one step too many" but then "subbed in another two step evaluation" (internal quotation marks omitted)). Accordingly, for ease of discussion, we similarly address the *Bruen* test in two separate steps.

inadequate for our review of the defendant's claim under the standard announced in *Bruen*. Consistent with other state and federal appellate courts,[16] we conclude that it is necessary to remand these cases to the trial court to give the parties the opportunity to develop the evidentiary record and to allow the court to consider the defendant's claim under *Bruen* in the first instance.[17]

[16] See, e.g., *Atkinson* v. *Garland*, 70 F.4th 1018, 1020, 1022 (7th Cir. 2023) ("the best course is to remand to allow the district court to undertake the *Bruen* analysis in the first instance" and to allow "proper, fulsome analysis of the historical tradition"); *Duncan* v. *Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022) (following remand from United States Supreme Court, remanding case to District Court for further proceedings consistent with *Bruen*); *Oakland Tactical Supply, LLC* v. *Howell Township*, Docket No. 21-1244, 2022 WL 3137711, *2 (6th Cir. August 5, 2022) (remanding case to District Court for further proceedings because appellate court was "unable to apply [the *Bruen*] standard based on the record and arguments currently before [it]"), aff'd, Docket No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. February 17, 2023), aff'd, 103 F. 4th 1186 (6th Cir. 2024), petition for cert. filed (U.S. August 20, 2024)(No. 24-178); *Sibley* v. *Watches*, Docket No. 21-1986-cv, 2022 WL 2824268, *1 (2d Cir. July 20, 2022) ("[w]e remand the case to the District Court to consider in the first instance the impact, if any, of *Bruen* on [the plaintiff's] claims"), dismissed, Docket No. 19-CV-6517-FPG, 2024 WL 1157047 (W.D.N.Y. March 18, 2024), appeal filed (2d Cir. April 4, 2024) (No. 24-855); *Ward* v. *United States*, 318 A.3d 520, 533 (D.C. 2024) ("whether the methodology laid out in *Bruen* leads to the conclusion that [the defendant's] conviction violated the [s]econd [a]mendment . . . is a question for the trial court to consider in the first instance, after the parties have been allowed to submit evidence and legal arguments"); *People* v. *Olson*, Docket No. D082081, 2024 WL 2122948, *4 (Cal. App. May 13, 2024) ("[u]ltimately, the trial court is best suited to engage in the analysis *Bruen* requires, assisted by a record replete with relevant factual and historical evidence offered by the parties"), review denied, California Supreme Court, Docket No. S285336 (July 29, 2024); *State* v. *Philpotts*, Docket No. 107374, 2023 WL 408984, *1 (Ohio App. January 26, 2023) (remanding case to trial court to allow parties to develop record and to allow trial court to apply "correct burden of proof and standard of review as set forth in *Bruen*"); see also *Matter of State for Fox*, Docket Nos. A-3418-21 and A-3419-21, 2024 WL 2842238, *7 (N.J. App. Div. June 5, 2024) (declining to consider second amendment claims raised for first time on appeal and remanding case to allow parties to develop record and to permit trial court to consider those claims under *Bruen* in first instance).

[17] The present cases are distinguishable from several cases in which appellate courts have decided post-*Bruen* second amendment claims in the first instance on appeal without the benefit of the trial court's application of the *Bruen* test. See, e.g., *Maryland Shall Issue, Inc.* v. *Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023) (there was "little room for debate" as to whether

During oral argument before this court, both parties' counsel, although preferring that we resolve the merits of the defendant's constitutional claims, acknowledged that a remand might be necessary. In particular, the defendant's counsel argued that we can resolve the present appeal by relying on "legislative facts" relevant to whether the items at issue constitute "arms" under the second amendment, such as the Second Circuit's finding in *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, supra, 804 F.3d 255, that "Americans own millions" of assault weapons, and by reviewing legislative history and analogous historical statutes. Counsel stated, however, that, if we find those legislative facts insufficient, then a remand would be appropriate. Similarly, the state's attorney argued that we can resolve this appeal by adopting the factual findings and reasoning of other courts that have concluded that assault weapons, including AR-15 style rifles, large capacity magazines,

handguns were protected "arms"), aff'd, Docket Nos. 21-2017 and 21-2053, 2024 WL 3908548 (4th Cir. August 23, 2024); *Teter* v. *Lopez*, 76 F.4th 938, 946–47 and n.6 (9th Cir. 2023) (presumption in favor of remand on basis of intervening change in law did not apply because "the historical research required under *Bruen* involves issues of so-called legislative facts . . . rather than adjudicative facts," state "already had a full opportunity to put forward a [factual] record as to why butterfly knives should be considered to be dangerous and unusual" under *Heller*, and, even if presumption in favor of remand applied, court could "confidently decide [the issue] [itself]" because state "ha[d] never cited an on-point historical analogue to [the challenged statute] even after having an opportunity to do so before both motions and merits panels" (internal quotation marks omitted)), vacated and reh'g en banc granted, 93 F.4th 1150 (9th Cir. 2024); *Range* v. *Attorney General*, 69 F.4th 96, 103 (3d Cir. 2023) (conduct of possessing rifle and shotgun for hunting and self-defense tracked constitutional right defined by *Heller*), vacated sub nom. *Garland* v. *Range*, Docket No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024); *United States* v. *Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (possession of pistol and rifle "easily [fell] within the purview of the [s]econd [a]mendment," and it was "undisputed that the types of firearms that [the defendant] possessed [were] in common use, such that they [fell] within the scope of the amendment" (internal quotation marks omitted)), rev'd on other grounds,      U.S.     , 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024); *Wade* v. *University of Michigan*, Docket No. 330555, 2023 WL 4670440, *8 (Mich. App. July 20, 2023) (court could easily conclude that handgun was "in common use" by citing *Bruen* (internal quotation marks omitted)).

and silencers are not "arms" protected by the second amendment and that prohibitions similar to those at issue in the present cases are consistent with our country's historical tradition of firearm regulation. Specifically, in its brief to this court, the state asks us to adopt other courts' findings, first, as to the function and purpose of silencers and large capacity magazines, and to conclude that both are "firearm accessories" unnecessary to the use of a firearm, rather than bearable arms protected by the second amendment. The state also asks us to adopt other courts' findings as to the commonality, dangerousness, and militaristic character of AR-15 style rifles, large capacity magazines, and silencers, and conclude that they are not protected arms because they are "not commonly used or particularly suitable for [civilian] self-defense" or "have uniquely dangerous properties that are more properly suited for military use." (Internal quotation marks omitted.) Additionally, the state urges us to adopt the historical analyses of other courts and to conclude that the statutes under which the defendant was convicted have relevant historical analogues that support their constitutionality.

Given that each party asks us to accept as true certain proposed facts, we find that the application of *Bruen* to the conduct at issue in the present cases involves disputed factual questions that must be resolved by the trial court, before which the parties can present evidence that "can be explained through expert testimony and tested through cross-examination." *State* v. *Edwards*, 314 Conn. 465, 481, 102 A.3d 52 (2014); see also *Oregon Firearms Federation* v. *Kotek*, 682 F. Supp. 3d 874, 886 n.2 (D. Or. 2023) (declining to consider "legislative fact" exhibits offered by plaintiffs because exhibits addressed adjudicative facts, that is, "factual questions that [the trial court] must answer, including the commonality of [large capacity magazines], their use by ordinary citizens, and the relevancy of certain

historical firearms regulations," so that court could "adequately assess issues of credibility or bias"), appeal filed sub nom. *Fitz* v. *Rosenblum* (9th Cir. July 17, 2023) (No. 23-35478), and appeal filed sub nom. *Azzopardi* v. *Rosenblum* (9th Cir. July 17, 2023) (No. 23-35479).[18] Moreover, because the state's brief fails to engage in any historical analysis beyond citing such analyses from other courts, we find that "[t]he parties' briefing on appeal only scratches the surface of the historical analysis now required by *Bruen*." *Atkinson* v. *Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023). *Bruen* instructs that courts "are not obliged to sift the historical materials for evidence to sustain [a] statute"; *New York State Rifle & Pistol Assn.*, *Inc.* v. *Bruen*, supra, 597 U.S. 70; rather, pursuant to the principle of party presentation, courts are "entitled to decide a [second amendment] case based on the historical record compiled by the parties." Id., 26 n.6. Accordingly, we decline to resolve the present appeal by applying other courts' factual findings and sifting through historical materials as a substitute for the development of an evidentiary record compiled by the parties, which we find is necessary to conduct the analysis that *Bruen* requires.[19] We therefore

---

[18] We note that the court in *Kotek* mentioned that "legislative facts are often considered by appellate courts deciding [s]econd [a]mendment challenges, see *Jones* v. *Bonta*, 34 F.4th 704, 726 n.24 (9th Cir. 2022), vacated, 47 F.4th 1124 . . . ." *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 886 n.2. In *Bonta*, the United States Court of Appeals for the Ninth Circuit considered legislative facts pertaining to the efficacy of nonsemiautomatic rifles, rimfire rifles, and shotguns for the purpose of self-defense, despite the plaintiffs' failure to submit those facts below. See *Jones* v. *Bonta*, supra, 725–26 and n.24. The court considered those facts, however, to evaluate the severity of the burden on the second amendment right of home self-defense in order to determine the appropriate level of scrutiny to apply under the second step of the pre-*Bruen* test. See id., 726. Moreover, the defendants did not contest the legislative facts presented by the plaintiffs. Id., 726 n.24. Accordingly, *Jones* v. *Bonta*, supra, 725–26, does not support an appellate court's de novo resolution of disputed factual questions pertinent to *Bruen*'s threshold inquiry of whether the conduct at issue is protected by the second amendment.

[19] See, e.g., *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 885, 888–89 (court held weeklong bench trial to resolve "disputed issues of fact involving whether [large capacity magazine restrictions] prohibit[ed]

remand these cases to the trial court for reconsideration of the defendant's motions to dismiss and to suppress under *Bruen*.

## II

On remand, the trial court must consider evidence presented by the parties and make factual findings consistent with the standard set forth in *Bruen*.[20] We recognize, however, that *Bruen* left several questions unanswered as to how to properly conduct its text and

conduct covered by the plain text of the [s]econd [a]mendment, such as whether [large capacity magazines] are in common use today for self-defense by law-abiding citizens with ordinary self-defense needs . . . [and] regarding the historical record that required [the trial court] to assess witness credibility and bias," resulting in culmination of "testimony from twenty witnesses" and "more than 100 exhibits" (citation omitted; internal quotation marks omitted)); see also *United States* v. *Daniels*, 77 F.4th 337, 361 (5th Cir. 2023) (Higginson, J., concurring) (reading *Bruen* as requiring "evidentiary inquiry first . . . conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion"), vacated,      U.S.     , 144 S. Ct. 2707,      L. Ed. 2d      (2024).

But see *Bevis* v. *Naperville*, 85 F.4th 1175, 1195–96 (7th Cir. 2023) (relying, in part, on findings in *Maryland Shall Issue, Inc.* v. *Moore*, 353 F. Supp. 3d 400 (D. Md. 2018), aff'd sub nom. *Maryland Shall Issue, Inc.* v. *Hogan*, 963 F.3d 356 (4th Cir. 2020), cert. denied,      U.S.     , 141 S. Ct. 2595, 209 L. Ed. 2d 731 (2021), and *Kolbe* v. *Hogan*, 849 F.3d 114 (2017) (overruled in part by *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)), cert. denied, 583 U.S. 1007, 138 S. Ct. 469, 199 L. Ed. 2d 374 (2017), as to similarities between AR-15 rifle and M-16 rifle for conclusion that AR-15 is not protected by second amendment, and plaintiffs therefore failed to show likelihood of success on merits for purposes of motion for preliminary injunction), cert. denied sub nom. *Harrel* v. *Raoul*,      U.S.     , 144 S. Ct. 2491,      L. Ed. 2d      (2024)); *People* v. *Jimenez*, Docket No. B323963, 2023 WL 8904157, *10 (Cal. App. December 27, 2023) (in relation to defendant's second amendment claim raised for first time on appeal, without mention of evidentiary hearing or any evidence presented by parties as to nature of firearm at issue, court relied on facts as stated in *Kolbe* v. *Hogan*, supra, 144, regarding features of semiautomatic centerfire rifle to support its own conclusion that assault weapons prohibited by California statute were "most useful in military service"), review denied, California Supreme Court, Docket No. S283546 (March 12, 2024).

[20] Additionally, the parties agreed, during oral argument before this court, that they would not be opposed to the participation of amici curiae, including the attorney general, on remand so long as both parties have the opportunity to respond to amici briefs. "[T]he fact, extent and manner of an amicus curiae's participation is entirely within the court's discretion and an amicus

history test, resulting in some confusion and divergent approaches among courts. See, e.g., *United States* v. *Daniels*, 77 F.4th 337, 358 (5th Cir. 2023) (Higginson, J., concurring) (It "has become increasingly apparent . . . that courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry. Those struggles encompass numerous, often dispositive, difficult questions . . . ."), vacated,  U.S.  , 144 S. Ct. 2707,  L. Ed. 2d  (2024); *Barris* v. *Stroud Township*, 310 A.3d 175, 189 (Pa. 2024) (acknowledging "various areas of uncertainty in *Bruen*'s method" and "difficulty courts are having in applying it consistently").[21]

Understandably, the parties in the present cases take different positions on what is required at several key points of the *Bruen* test, including what showing is required at the initial plain text inquiry and what makes

curiae may ordinarily be heard only by leave of the court." (Internal quotation marks omitted.) *State* v. *Ross*, 272 Conn. 577, 611, 863 A.2d 654 (2005). Accordingly, we leave it to the trial court to decide whether to also seek input from the attorney general, as an amicus or otherwise, and to accept amici briefs generally to assist with its inquiry on remand.

[21] The United States Supreme Court's recent decision in *United States* v. *Rahimi*, supra, 144 S. Ct. 1889, illustrates that even the members of that court are having difficulty agreeing on how to apply *Bruen*. Despite the near unanimous decision in *Rahimi*, there were five separate concurring opinions, in addition to a dissenting opinion. Each separate opinion provided either a somewhat different, or more nuanced, understanding of *Bruen* or a criticism of *Bruen*'s analytical approach. And, despite the court's statement in *Bruen* that its test requires a "straightforward historical inquiry" involving "reasoning by analogy—a commonplace task for any lawyer or judge"; *New York State Rifle & Pistol Assn.*, *Inc.* v. *Bruen*, supra, 597 U.S. 27–28; Justice Gorsuch acknowledged in his concurrence in *Rahimi* that "[d]iscerning what the original meaning of the [c]onstitution requires in this or that case may sometimes be difficult" and that "reasonable minds can disagree [on] whether [a statute] is analogous to past practices originally understood to fall outside the [s]econd [a]mendment's scope . . . ." *United States* v. *Rahimi*, supra, 1909 (Gorsuch, J., concurring). In fact, Justice Thomas, the author of the majority opinion in *Bruen*, was the lone dissenter in *Rahimi* because he believed that the majority improperly applied the *Bruen* analysis. See id., 1941 (Thomas, J., dissenting) (majority's "piecemeal approach [to the historical analysis] is not what the [s]econd [a]mendment or our precedents countenance"). Consequently, it is hardly surprising that other courts have struggled with how to properly apply *Bruen*.

a historical analogue "sufficiently analogous." These are among the numerous questions about *Bruen*'s methodology that Justice Jackson recently observed remain "unresolved" following the Supreme Court's recent decision in *United States* v. *Rahimi*, supra, 144 S. Ct. 1929 (Jackson, J., concurring). Because the resolution of these legal questions will frame the trial court's analysis of the defendant's motions on remand, we provide some guidance on these points based on *Bruen*, *Heller*, and lower court decisions applying those cases. See *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164, 971 A.2d 676 (2009) ("[b]ecause of our conclusion that this case must be remanded for a new trial, it is appropriate for us to give guidance on issues that are likely to recur on retrial"); see also *Atkinson* v. *Garland*, supra, 70 F.4th 1023–24 (setting forth questions for trial court to consider on remand to focus analysis under *Bruen*); *Ward* v. *United States*, 318 A.3d 520, 533 (D.C. 2024) ("given the novelty of [*Bruen*'s] methodology . . . identify[ing] key steps and considerations" of that methodology "to limit the possibility of a further, avoidable remand").

In short, we conclude that *Bruen* requires the following showing in second amendment cases.[22] The initial

[22] The defendant notes in his principal brief on appeal that he argued before the trial court "that his actions were protected under the second amendment [to the federal constitution] *and* article first, § 15, of the Connecticut constitution." (Emphasis added.) The only further discussion of the state constitution in his brief is limited to recognizing that "this court has not yet interpreted our state constitution as granting broader rights than the second amendment. Instead, Connecticut has traditionally reviewed challenges under this provision through a balancing test . . . . A balancing test was rejected by *Bruen* as inconsistent with the second amendment." (Citation omitted.) "Because the [defendant has] furnished no reason why we should interpret our state constitutional provision differently than its federal counterpart, we construe the provisions identically for the purposes of this case. Cf. *State* v. *Barnes*, 232 Conn. 740, 744 n.4, 657 A.2d 611 (1995) (refusing to entertain state constitutional claim where party failed to provide independent analysis of state constitutional provision at issue) . . . ." (Citations omitted.) *Benjamin* v. *Bailey*, supra, 234 Conn. 481 n.14.

step requires that the defendant, as the party challenging the statutes at issue in the present cases, show, by a preponderance of the evidence, that his conduct falls within the plain text of the second amendment, i.e., that the items at issue, first, are "arms," and second, are in common use or typically possessed for lawful purposes like self-defense. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 32 (noting, in relation to whether second amendment's plain text protected carrying handguns publicly for self-defense, that it was undisputed "that handguns are weapons in common use today for self-defense" (internal quotation marks omitted)); *District of Columbia* v. *Heller*, supra, 554 U.S. 625, 627 (second amendment protects weapons "in common use at the time" and "not . . . those weapons not typically possessed by law-abiding citizens for lawful purposes" (internal quotation marks omitted)). If the defendant makes the necessary threshold showing as to any of the firearms or related components at issue, then the plain text of the second amendment "presumptively protects" the defendant's right to keep and bear that firearm or related component. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 24. The second step then requires the state to affirmatively prove, by presenting "relevantly similar" historical analogues, that its regulation of the protected "arm" is nonetheless "consistent with the [n]ation's historical tradition of firearm regulation" and is, therefore, constitutional. Id., 24, 29. We address each step in greater detail.

## A

As to *Bruen*'s first step, although the court in *Heller* initially stated that "the [s]econd [a]mendment extends, prima facie, to *all instruments that constitute bearable arms*"; (emphasis added) *District of Columbia* v. *Heller*, supra, 554 U.S. 582; the court nonetheless made clear that "the [s]econd [a]mendment right, whatever

its nature, extends *only to certain types of weapons.*" (Emphasis added.) Id., 623. Thus, *Bruen*'s threshold inquiry—whether the individual's conduct falls within the second amendment's plain text—necessarily requires a court to consider whether the item that the individual seeks to "keep" or "bear" is an "arm" that is entitled to second amendment protection.

The state concedes that an AR-15 style rifle is an "arm," and disputes neither that the defendant is one of "the people" protected by the second amendment nor that the defendant's conduct in relation to the weapons at issue is covered by the second amendment. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 31–32 (in relation to first step of *Bruen* test, noting that "[i]t is undisputed that [the] petitioners . . . two ordinary, law-abiding, adult citizens—are part of 'the people' whom the [s]econd [a]mendment protects" and considering "whether the plain text of the [s]econd [a]mendment protects [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense").[23] Moreover, neither party disputes that the defendant bears the burden at step one to show that the silencers and large capacity magazines that he possessed are "arms."[24] Nevertheless, the parties disagree on (1) whether a firearm component such as

---

[23] See also *United States* v. *Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry" into "whether the challenger is part of the people whom the [s]econd [a]mendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the [s]econd [a]mendment" (internal quotation marks omitted)). But see *United States* v. *Pierret-Mercedes*, Docket No. CR 22-430 (ADC), 2024 WL 1672034, *5 (D. Puerto Rico April 18, 2024) ("[t]here is a divergence of opinion in the federal courts on whether any analysis on a person's inclusion in 'the people' is necessary to evaluate constitutional challenges under the [s]econd [a]mendment").

[24] The United States Supreme Court was silent on the issue of who carries the burden of making the threshold showing at *Bruen*'s first step. See *Barris* v. *Stroud Township*, supra, 310 A.3d 187 (although *Bruen* left "no room to doubt that the government shoulders the burden once the history-and-tradition test is triggered, the [United States Supreme] Court said nothing about who bears the initial burden to show the plain text covers [the] individual's conduct" (internal quotation marks omitted)). In the present

a silencer or large capacity magazine is an "arm" within the plain text of the second amendment, (2) whether step one of the *Bruen* test requires the defendant to show *only* that the firearms and firearm components at issue are "arms," or that the defendant also must

---

cases, we conclude, and the parties agree, that the defendant, as the party challenging the statutes at issue, bears the burden to make that threshold showing. That approach is consistent with not only a majority of the courts that have expressly decided the issue or implicitly assigned the burden to one party at step one; see, e.g., *Oakland Tactical Supply, LLC* v. *Howell Township*, 103 F.4th 1186, 1197–98 (6th Cir. 2024), petition for cert. filed (U.S. August 20, 2024) (No. 24-178); *Maryland Shall Issue, Inc.* v. *Moore*, 86 F.4th 1038, 1042 (4th Cir. 2023), aff'd, Docket Nos. 21-2017 and 21-2053, 2024 WL 3908548 (4th Cir. August 23, 2024); *National Assn. for Gun Rights* v. *Lamont*, 685 F. Supp. 3d 63, 89 (D. Conn. 2023); *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 888; *Hartford* v. *Ferguson*, 676 F. Supp. 3d 897, 903–904 (W.D. Wn. 2023); *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept. of Safety & Homeland Security*, 664 F. Supp. 3d 584, 591 (D. Del. 2023), aff'd, 108 F.4th 194 (3d Cir. 2024); *Ocean State Tactical, LLC* v. *Rhode Island*, 646 F. Supp. 3d 368, 377 (D.R.I. 2022), aff'd, 95 F.4th 38 (1st Cir. 2024), petition for cert. filed (U.S. August 2, 2024) (No. 24-131); *People* v. *Leedy*, Docket No. C098151, 2024 WL 828255, *3 (Cal. App. February 28, 2024), review denied, California Supreme Court, Docket No. S284349 (May 15, 2024); *People* v. *Smith*, Docket No. 2-22-0340, 2023 WL 8436305, *11 (Ill. App. December 5, 2023); but also with *Bruen*'s suggestion that its test involves burden-shifting. In *Bruen*, "[t]he Supreme Court explicitly states that 'when the [s]econd [a]mendment's plain text covers an individual's conduct . . . the government *must then* justify its regulation . . . .' " (Emphasis in original.) *Oregon Firearms Federation* v. *Kotek*, supra, 888 n.4. "This Supreme Court language strongly suggests that the burden shifts to the government only after the [party challenging the regulation has] shown that the [regulated] conduct is covered by the plain text of the [s]econd [a]mendment." Id.; see also *National Assn. for Gun Rights* v. *Lamont*, supra, 88 ("*Bruen*'s mandate provides that *if* the [s]econd [a]mendment's plain text creates the presumption, *then* the government must justify its regulation" (emphasis in original; internal quotation marks omitted)).

Additionally, we find it unlikely that *Bruen* assigns no burden whatsoever to the challenger. But see *Bevis* v. *Naperville*, 85 F.4th 1175, 1209 (7th Cir. 2023) (Brennan, J., dissenting) ("The government parties . . . incorrectly attempt to place a burden on the [party challenging the regulation] to show that the plain text of '[a]rms' includes the banned firearms. *Bruen* does not say that. Instead, *Bruen* states that when the [s]econd [a]mendment's text covers an individual's conduct, the [c]onstitution presumptively protects it."), cert. denied sub nom. *Harrel* v. *Raoul*, U.S. , 144 S. Ct. 2491, L. Ed. 2d (2024); *Teter* v. *Lopez*, 76 F.4th 938, 948–50 (9th Cir. 2023) (considering threshold inquiry under *Bruen* without assigning step one burden to either party, thus placing no burden on challenger), vacated and reh'g en banc granted, 93 F.4th 1150 (2024).

show that those arms are "in common use" or "typically possessed by law-abiding citizens for lawful purposes" and are not "dangerous and unusual" weapons, and (3) how a court determines whether an arm is "in common use" or "dangerous and unusual." Thus, for purposes of applying the first step of the *Bruen* test in the present cases, we provide some guidance to assist the trial court in resolving these difficult questions. In doing so, we note that, because the defendant raises as applied challenges to the statutes at issue, he must satisfy the threshold inquiry only as to the AR-15 style rifles,[25] silencers, and large capacity magazines that he possessed or sold, rather than as to all weapons prohibited by those statutes. See *State* v. *Long*, 268 Conn. 508, 522 n.21, 847 A.2d 862 (facial challenge means claim that law is "incapable of any valid application" and, unlike as applied challenge, "is not dependent on the facts of a particular case" (internal quotation marks omitted)), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). As to each of the statutes at issue, if the defendant fails to satisfy his initial burden, then the statute stands because the regulated conduct falls outside of the second amendment's scope.

1

First, the United States Supreme Court has not yet squarely addressed whether firearm components qualify as "arms" within the meaning of the second amendment's plain text. We nonetheless conclude that *Bruen*

---

[25] The record does not consistently identify the type of firearms that the defendant was convicted of selling. The arrest warrant application identifies the firearms both as "AR-15 style semi-automatic .223 caliber assault rifle[s]" and "AR-15 assault rifles." During oral argument before this court, counsel for the defendant indicated that the defendant had conceded that the rifles at issue were "assault weapons" as that term is defined in General Statutes § 53-202a. Given that the statutory definition of "assault weapon" encompasses numerous specified semiautomatic firearms, including but not limited to the AR-15, counsel for the defendant also acknowledged that additional fact-finding may be necessary on remand to determine the specific type of rifles at issue for the purposes of applying *Bruen*.

and *Heller* support the idea that, like firearms, not all firearm components are protected by the second amendment; rather, the right to keep and bear arms includes the right to keep and bear components that are necessary to effectively use those arms.

*Heller* defined "arms" as "[w]eapons of offence" that can be used to "cast at or strike another." (Internal quotation marks omitted.) *District of Columbia* v. *Heller*, supra, 554 U.S. 581. Some courts have concluded that certain firearm components are not "arms" because they do not independently meet that definition. See, e.g., *Firearms Regulatory Accountability Coalition, Inc.* v. *Garland*, 691 F. Supp. 3d 1043, 1053 (D.N.D. 2023) ("a stabilizing brace, like a silencer, cannot cause harm on its own and is not a bearable arm which would implicate [s]econd [a]mendment protections"), rev'd on other grounds, 112 F.4th 507 (2024); *United States* v. *Cooperman*, Docket No. 22-CR-146, 2023 WL 4762710, *1 (N.D. Ill. July 26, 2023) ("as a firearm accessory, silencers are not weapons and therefore cannot be 'bearable arms' protected by the [s]econd [a]mendment"). Other courts, however, have applied a test that asks whether the firearm component is "necessary" or "essential" to operate a firearm as intended. See, e.g., *United States* v. *Berger*, Docket No. 5:22-cr-00033, 2024 WL 449247, *17 (E.D. Pa. February 6, 2024) ("if there is a line of demarcation between firearm components entitled to [s]econd [a]mendment protection as bearable '[a]rms,' determining which components are necessary to the operation of the firearm appears to constitute a reasonable limitation on the scope of the [s]econd [a]mendment"); *Capen* v. *Campbell*, Docket No. CV 22-11431-FDS, 2023 WL 8851005, *17 (D. Mass. December 21, 2023) ("some accessories, such as silencers, do not affect the essential operation of a weapon and so do not fall within the scope of the [s]econd [a]mendment's protection"), appeal filed, 2023 WL 8851005 (1st Cir.

January 17, 2024) (No. 24-1061); *Duncan* v. *Bonta*, 695 F. Supp. 3d 1206, 1224 (S.D. Cal. 2023) (magazine falls within meaning of "arms" because it "is an essential component without which a semiautomatic firearm is useless for self-defense"), appeal filed (9th Cir. September 25, 2023) (No. 23-55805); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 93 (D. Conn. 2023) ("components of firearms that are necessary to their operation, such as ammunition, are covered by the [s]econd [a]mendment");[26] *United States* v. *Saleem*, 659 F. Supp. 3d 683, 697–98 (W.D.N.C. 2023) (silencers are not "necessary to render a firearm functional" or to "safely and effectively" use a firearm), appeal filed (4th Cir. November 15, 2023) (No. 23-4693).[27] The "necessary" or "essential" test finds substantial support in *Heller* and *Bruen* and, therefore, is the one that we are compelled to follow.

---

[26] In *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 94, the court also phrased the relevant inquiry as whether a large capacity magazine is "a modern instrument" that merely "*facilitate*[*s*] armed self-defense." (Emphasis added; internal quotation marks omitted.); see also *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 28 ("general definition [of 'arms'] covers modern instruments that facilitate armed self-defense"). We are not persuaded that this is the proper inquiry because "it would seemingly open the door to significantly broader [s]econd [a]mendment protections for firearm components"; *United States* v. *Berger*, supra, 2024 WL 449247, *17 n.19; and perhaps even other unrelated items, than the court in *Bruen* likely intended by using that phrase in passing. See id. (interpreting "facilitate" to mean "[t]o make the occurrence of (something) easier; to render less difficult" (internal quotation marks omitted)).

[27] See also *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 911–13 (although "courts have found that the [s]econd [a]mendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," and that "magazines are often necessary to render certain firearms operable," large capacity magazines specifically are "never necessary to render firearms operable" and, therefore, "are not bearable arms" (internal quotation marks omitted)); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 10 (D.D.C. 2023) (following persuasive reasoning of United States Court of Appeals for Third Circuit to conclude that large capacity magazines "are arms under the [s]econd [a]mendment because magazines *feed* ammunition into certain guns, and ammunition is necessary for such a gun to function as intended" (emphasis in original; internal quotation marks omitted)), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061).

In *Heller*, the court held that the District of Columbia's "requirement (as applied to [the] respondent's handgun) that firearms in the home be rendered and kept inoperable at all times" was unconstitutional because it made "it impossible for citizens to use [those firearms] for the core lawful purpose of self-defense . . . ." *District of Columbia* v. *Heller*, supra, 554 U.S. 630. In other words, *Heller* recognized that the right to keep and bear arms includes a right to use those arms and to keep them in operable condition ready for such use. See id., 617–18 (quoting T. Cooley, Treatise on Constitutional Limitations (1868) p. 271, as example of post-Civil War commentary interpreting second amendment right, for proposition that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use" (internal quotation marks omitted)). Similarly, in *Bruen*, the court confirmed that the "[s]econd [a]mendment protects the possession *and use* of weapons . . . ." (Emphasis added.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 21. Indeed, "without this right to use the guaranty would have hardly been worth the paper it consumed." (Internal quotation marks omitted.) *District of Columbia* v. *Heller*, supra, 609 (quoting J. Tiffany, A Treatise on the Unconstitutionality of American Slavery (1849) pp. 117–18, to illustrate founding era public understanding of second amendment right). It follows, therefore, that the second amendment, in addition to protecting arms in common use today for lawful purposes like self-defense, also must protect components that are necessary or essential to operate such an arm as intended. See *United States* v. *Miller*, 307 U.S. 174, 180, 59 S. Ct. 816, 83 L. Ed. 1206 (1939) (in New England in 1600s, "[t]he possession of arms also implied the possession of ammunition, and the authorities paid quite as much

attention to the latter as to the former" (internal quotation marks omitted)).

Consequently, on remand, the defendant, as a predicate to his constitutional challenges to §§ 53a-211 and 53-202w (c) (2), must prove that the silencers and large capacity magazines, even if they are not independently "[w]eapons of offence" that can be used to "cast at or strike another"; (internal quotation marks omitted) *District of Columbia* v. *Heller*, supra, 554 U.S. 581; nonetheless fall within the term "arms" because they are necessary or essential to effectively operate a constitutionally protected firearm as intended. If the defendant fails to demonstrate that the silencers and large capacity magazines are necessary or essential to the effective use of a protected arm, the court's analysis as to those instruments ends there and the defendant's constitutional challenge fails. If those firearm components do meet that criterion, however, then the court, for the reasons set forth in part II A 2 of this opinion, must proceed to consider whether the defendant has shown that the silencers and large capacity magazines, as well as the AR-15 style rifles, are in common use within the meaning of *Heller* and *Bruen*.

2

The defendant does not dispute that he has the burden of proving that his conduct is covered by the second amendment's plain text. The parties do not agree, however, as to whether the defendant must show only that the firearms and firearm components at issue are "arms," or whether he instead bears the additional burden of demonstrating that they are arms in common use or typically possessed for lawful purposes like self-defense. In other words, "[d]oes the challenging party have the burden at step one to show a regulated weapon is in common use for lawful purposes? Or does the government have the burden at step two to prove a

negative—the regulated weapon is not in common use for lawful purposes?" (Emphasis omitted.) *People* v. *Leedy*, Docket No. C098151, 2024 WL 828255, *2 (Cal. App. February 28, 2024), review denied, California Supreme Court, Docket No. S284349 (May 15, 2024). As the United States Court of Appeals for the Seventh Circuit has recognized, "[t]here is no consensus" among courts on this issue. *Bevis* v. *Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023), cert. denied sub nom. *Harrel* v. *Raoul*,       U.S.     , 144 S. Ct. 2491,       L. Ed. 2d     (2024).

In the present cases, the state, acknowledging that courts take different positions on whether the common use and dangerous and unusual analyses inform the threshold plain text inquiry or the historical inquiry under *Bruen*, addresses those issues at both steps of the analysis in its appellate brief. The defendant asserts, however, that he does not have a burden to show that the items at issue are commonly used for self-defense, typically possessed by law-abiding citizens, or not "dangerous and unusual." According to the defendant, his burden at step one is merely to "assert that his conduct falls within the plain text of the second amendment," meaning, in the context of these cases, that the items at issue are "arms" or are "necessary" or "essential" to the functioning of a protected "arm." He argues that, if he satisfies this threshold, the burden then shifts to the state to show that his conduct falls outside of the second amendment's scope. At oral argument before this court, the defendant's counsel further argued that the defendant has the burden at *Bruen*'s first step to prove in "the broadest sense" that the items at issue fall within the scope of the second amendment, and that the state has the burden to justify any exemptions to second amendment protection.[28] For the following

[28] The defendant's counsel also suggested during oral argument before this court, however, that the defendant might have the burden of proving that the items are both commonly owned in the United States and "used in a lawful manner."

reasons, we conclude that "common use," along with the related "typical possession" and "dangerous and unusual" considerations, are part of *Bruen*'s first step, where the party challenging a firearm statute bears the burden of proof.

One reason that courts frequently cite for placing the common use inquiry at step one is that the United States Supreme Court seemingly did so in *Bruen*. Specifically, the Supreme Court began its analysis in *Bruen* by stating: "It is undisputed that [the] petitioners . . . two ordinary, law-abiding, adult citizens—are part of 'the people' whom the [s]econd [a]mendment protects. . . . *Nor does any party dispute that handguns are weapons 'in common use' today for self-defense.* . . . We therefore turn to whether the plain text of the [s]econd [a]mendment protects [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." (Citations omitted; emphasis added.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 31–32. Several courts view that language as a command from the Supreme Court to consider common use in relation to whether the second amendment protects the conduct at issue, rather than in relation to whether the regulation is consistent with this country's history and tradition of firearms regulation. See, e.g., *United States* v. *Teston*, Docket No. CR-22-1400 JB, 2024 WL 1621512, *19, 21 (D.N.M. April 15, 2024) ("most federal cases post-*Bruen* have taken this language as a command that [the] 'in common use' analysis should be undertaken as part of a court's step-one, plain-text analysis under *Bruen*," and District Court would "not presume that the Supreme Court's approach to the *Bruen* analysis . . . [was] careless or casual").[29] Given

___

[29] See also *United States* v. *Berger*, supra, 2024 WL 449247, *3, 6 ("the [United States Supreme] Court seemingly included the common-use issue at step one of its clarified [s]econd [a]mendment analysis," and there was "no reason to believe that this happened accidentally"); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 88 (clear that challengers had burden to make initial showing because Supreme Court "considered

that *Bruen* also referenced the popularity of handguns for self-defense in relation to the second step of its analysis, however, the court's passing reference to " 'common use' " in relation to the plain text inquiry is not dispositive. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 32; see also id., 47 ("colonial laws prohibit[ing] the carrying of handguns because they were considered dangerous and unusual weapons in the 1690s . . . provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today") (internal quotation marks omitted)).

Nevertheless, in *Heller*, the Supreme Court used the phrase "in common use at the time" to define "the sorts of weapons protected" by the second amendment. (Internal quotation marks omitted.) *District of Columbia* v. *Heller*, supra, 554 U.S. 627. Indeed, in both *Heller* and *Bruen*, the court explained that not all "[w]eapons of offence" that can be used "to cast at or strike another"; (internal quotation marks omitted) id., 581; constitute protected "arms." Although the court in *Heller* initially stated that "the [s]econd [a]mendment extends, prima facie, to *all instruments that constitute bearable arms*"; (emphasis added) id., 582; the court, in rejecting Justice Stevens' argument in his dissenting opinion that the court's interpretation of the second amendment in *Heller* was inconsistent with the court's prior decision in *United States* v. *Miller*, supra, 307 U.S. 174, also stated that "*Miller* stands only for the

whether handguns were arms that were in common use today for self-defense and whether the plain text of the [s]econd [a]mendment covered the petitioner's proposed course of conduct of carrying handguns publicly for self-defense before shifting the burden to [the] respondents to justify the regulation" (emphasis omitted; internal quotation marks omitted)); *People* v. *Leedy*, supra, 2024 WL 828255, *3 ("the *Bruen* court covered common use when discussing the applicability of the [s]econd [a]mendment's plain text, not when discussing the historical tradition of firearm regulation").

proposition that the [s]econd [a]mendment right, whatever its nature, extends *only to certain types of weapons.*" (Emphasis added.) *District of Columbia* v. *Heller*, supra, 623. In *Miller*, the Supreme Court upheld a federal prohibition on transporting an unregistered, short-barreled shotgun in interstate commerce, reasoning that, "[i]n the absence of any evidence tending to show that possession or use of a shotgun having a barrel of less than eighteen inches in length at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the [s]econd [a]mendment guarantees the right to keep and bear such an instrument. Certainly, it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." (Internal quotation marks omitted.) *United States* v. *Miller*, supra, 175, 178.

In *Heller*, the court rejected Justice Stevens' argument in his dissenting opinion that *Miller*'s " 'ordinary military equipment' " language meant that "only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that . . . restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939." *District of Columbia* v. *Heller*, supra, 554 U.S. 624. Instead, the court stated that "*Miller*'s ordinary military equipment language must be read in tandem with what comes after: [O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time. . . . The traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense. In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same. . . . We therefore read *Miller* to say only that

*the* [s]*econd* [a]*mendment does not protect those weap-*
*ons not typically possessed by law-abiding citizens*
*for lawful purposes, such as short-barreled shotguns.*
*That accords with the historical understanding of the*
*scope of the right . . . .*" (Citations omitted; emphasis
added; internal quotation marks omitted.) Id., 624–25.
In other words, the court concluded that, under *Miller*,
the second amendment protects "the sorts of weapons
. . . in common use at the time" and explained that
this is an "important limitation on the right to keep and
carry arms . . . that . . . is fairly supported by the
historical tradition of prohibiting the carrying of danger-
ous and unusual weapons." (Citation omitted; internal
quotation marks omitted.) Id., 627. In *Bruen*, the court
reiterated *Heller*'s point that "the [s]econd [a]mend-
ment protects the possession and use of weapons that
are in common use at the time." (Internal quotation
marks omitted.) *New York State Rifle & Pistol Assn.,*
*Inc.* v. *Bruen*, supra, 597 U.S. 21.

Further, the court in *Heller* strongly suggested, con-
sistent with the common use limitation, that weapons
that are "most useful in military service—M-16 rifles[30]
and the like—may be banned"; (footnote added) *Dis-*
*trict of Columbia* v. *Heller*, supra, 554 U.S. 627; without
violating the second amendment. See id. (immediately
following discussion of common use limitation, court
rejected argument "that if weapons that are most useful
in military service—M-16 rifles and the like—may be
banned, then the [s]econd [a]mendment right is com-
pletely detached from the prefatory clause"). As the

[30] The United States Supreme Court has described the M-16 as "a selective
fire rifle that allows the operator, by rotating a selector switch, to choose
semiautomatic or automatic fire." *Staples* v. *United States*, 511 U.S. 600,
603, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). It is a "standard issue . . .
military service rifle used by the United States Army and other nations'
armed forces . . . ." *Soto* v. *Bushmaster Firearms International, LLC*, 331
Conn. 53, 70, 202 A.3d 262 (2019), cert. denied sub nom. *Remington Arms*
*Co., LLC* v. *Soto*,      U.S.     , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

court reiterated, "the conception of the militia at the time of the [s]econd [a]mendment's ratification was the body of all citizens capable of military service, who would bring *the sorts of lawful weapons that they possessed at home* to militia duty." (Emphasis added.) Id. Although recognizing that, today, "a militia, to be as effective as militias in the 18th century, [may] require sophisticated arms that are highly unusual in society at large," the court declined to alter its interpretation of the second amendment right to account for "modern developments [that] have limited the degree of fit between the prefatory clause and the protected right . . . ." Id., 627–28.

Consequently, the common use analysis informs whether the conduct at issue is covered by the second amendment's plain text and asks whether an instrument, even if it is an "arm," is the type of arm that is protected by the second amendment—that is, as *Bruen* and *Heller* instruct, an arm that is commonly used or typically possessed for lawful purposes like self-defense—or is instead a dangerous and unusual weapon that falls outside of the second amendment's scope. See *New York State Rifle & Pistol Assn.*, *Inc.* v. *Bruen*, supra, 597 U.S. 21; *District of Columbia* v. *Heller*, supra, 554 U.S. 624–27. In other words, because *Bruen*'s threshold inquiry as to whether the plain text protects the conduct at issue necessarily requires courts to interpret the meaning of "arms" in the second amendment, and because *Bruen* and *Heller* make clear that the second amendment protects arms "in common use at the time"; (internal quotation marks omitted) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 21; *District of Columbia* v. *Heller*, supra, 624; it is sensible to consider common use at *Bruen*'s first step. See, e.g., *United States* v. *Lane*, 689 F. Supp. 3d 232, 252 n.22 (E.D. Va. 2023) ("[b]ecause determining which 'arms' the amendment covers is a textual matter," and *Heller*

"explained that the 'in common use' label limits 'the sorts of weapons protected' " by the [s]econd [amendment], the " 'common use' " and " 'dangerous and unusual' " issues are "part of the textual analysis at *Bruen*'s step one"), appeal filed (4th Cir. February 7, 2024) (No. 24-4083).[31]

Our conclusion finds further support in *Heller*'s apparent exclusion of machine guns and short-barreled shotguns from the class of constitutionally protected arms. In stating that it would be "startling" if *Miller* stood for the proposition that "only those weapons useful in warfare are protected . . . since it would mean that . . . restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939," the court suggested that restrictions on machine guns are constitutional. *District of Columbia* v. *Heller*, supra, 554 U.S. 624. The court further explained, "*Miller*'s ordinary military equipment language must be read in tandem with what comes after: [O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time.* . . . We therefore read *Miller* to say only that *the [s]econd [a]mendment does not protect those*

---

[31] See also *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept. of Safety and Homeland Security*, 664 F. Supp. 3d 584, 591 (D. Del. 2023) (textual analysis at step one of *Bruen* is driven by several key limitations to scope of second amendment coverage, including that second amendment extends only to bearable arms in common use today for self-defense and does not extend to dangerous and unusual weapons), aff'd, 108 F.4th 194 (3d Cir. 2024); *People* v. *Leedy*, supra, 2024 WL 828255, *3 ("consistent with *Bruen*, *Heller* suggests that common use is critical to understanding the types of weapons considered to be bearable '[a]rms,' a textual issue"); see also *Bevis* v. *Naperville*, supra, 85 F.4th 1193, 1198 (although assuming, without deciding, that "common use" belongs at step two, considering at first step of *Bruen* analysis "what exactly falls within the scope of 'bearable' [a]rms" that the court in *Heller* indicated were, prima facie, "protected by the second amendment" and concluding that "the definition of 'bearable [a]rms' extends only to weapons in common use for a lawful purpose").

*weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 624–25. The court thus suggested that certain weapons, such as machine guns and short-barreled shotguns, are categorically excluded from the second amendment right and that the state therefore may regulate such weapons, solely on the ground that they are not in common use or are not typically possessed by law-abiding citizens for lawful purposes, rather than on the ground that there are relevantly similar historical analogues restricting the possession of those weapons. Such reasoning supports our conclusion that the common use analysis informs the scope of the second amendment right.

Moreover, our conclusion is consistent with that of a majority of other courts that have decided the issue.[32]

---

[32] See, e.g., *United States* v. *Veasley*, 98 F.4th 906, 910 (8th Cir. 2024), petition for cert. filed (U.S. July 12, 2024) (No. 24-5089); *Antonyuk* v. *Chiumento*, 89 F.4th 271, 304–305 (2d Cir. 2023), vacated sub nom. *Antonyuk* v. *James*, Docket No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024); *United States* v. *Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *United States* v. *Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), rev'd, U.S. , 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024); *United States* v. *Lightner*, Docket No. 8:24-cr-21-WFJ-CPT, 2024 WL 2882237, *2 (M.D. Fla. June 7, 2024); *United States* v. *Mitchell*, Docket No. 1:24-cr-9, 2024 WL 2272275, *3 (N.D. Ohio May 20, 2024); *United States* v. *Teston*, Docket No. CR 22-1400 JB, 2024 WL 1621512, *18 (D.N.M. April 15, 2024); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 10–11 (D.D.C. 2023), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061); *Delaware State Sportsmen's Assn.*, *Inc.* v. *Delaware Dept. of Safety & Homeland Security*, 664 F. Supp. 3d 584, 591 (D. Del. 2023), aff'd, 108 F.4th 194 (3d Cir. 2024); *United States* v. *Saleem*, supra, 659 F. Supp. 3d 690; *People* v. *Leedy*, supra, 2024 WL 828255, *2.

At least one court, however, has concluded that the issue of whether a weapon is in common use or is dangerous and unusual is properly considered at step two, at which the state bears the burden of proof. See *Teter* v. *Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the historical tradition of prohibiting the carrying of dangerous and unusual weapons. . . . It did not say that dangerous and unusual weapons are not arms. Thus, whether butterfly knives are dangerous and unusual is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis." (Citation omitted; emphasis omitted; internal quotation marks omitted.)), vacated and reh'g en banc granted, 93 F.4th 1150 (9th Cir. 2024).

Although not all of those courts decided which party bears the burden of proof on the common use issue,[33] a majority of courts that have considered common use at the first step have placed the burden of proof on that issue on the party challenging the statute at issue.[34]

It may be argued that *Bruen*'s first step is purely a textual inquiry and that the common use limitation, which is drawn from history and is not expressly contained in the amendment's plain text, has no place in that inquiry but, rather, is properly addressed as part of *Bruen*'s second step.[35] For instance, in a dissenting

Other courts have declined to decide the issue of the placement of the "common use" inquiry altogether. For instance, in *Bevis*, the Seventh Circuit defined the step one inquiry as whether the weapons at issue are "[a]rms that individual persons are entitled to keep and bear," which, it concluded, "extend[ed] only to weapons in common use for a lawful purpose." (Internal quotation marks omitted.) *Bevis* v. *Naperville*, supra, 85 F.4th 1192, 1193. After resolving the appeal at step one of the analysis, however, the court, turning to the second step "for the sake of completeness," acknowledged the lack of consensus on the placement of the "common use" factor and, despite its initial placement of that factor at the first step, "assume[d] (without deciding the question) that this is a step two inquiry, where the state bears the burden of proof." Id., 1197–98.

[33] See, e.g., *United States* v. *Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (court "assume[d], without deciding, that step one of the *Bruen* test [was] met"); *United States* v. *Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (noting that it was undisputed that pistol and rifle were in common use), rev'd on other grounds, U.S. , 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 10–16 (D.D.C. 2023) (assessing whether second amendment protects large capacity magazines, including whether they are "in common use," without assigning burden of proof on threshold inquiry to either party), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061).

[34] See, e.g., *Vermont Federation of Sportsmen's Clubs* v. *Birmingham*, Docket No. 2:23-cv-710, 2024 WL 3466482, *5 (D. Vt. July 18, 2024), appeal filed, 2024 WL 3466482 (2d Cir. July 31, 2024) (No. 24-2026); *United States* v. *Myers*, Docket No. 3:22-CR-00067-ART-CSD-1, 2024 WL 2924081, *4 (D. Nev. June 10, 2024); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 88 (D. Conn. 2023); *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept. of Safety & Homeland Security*, 664 F. Supp. 3d 584, 591 (D. Del. 2023), aff'd, 108 F.4th 194 (3d Cir. 2024); *Oregon Firearms Federation, Inc.* v. *Brown*, 644 F. Supp. 3d 782, 799 (D. Or. 2022), appeal dismissed, Docket No. 22-36011, 2022 WL 18956023 (9th Cir. December 12, 2022); *People* v. *Leedy*, supra, 2024 WL 828255, *3.

[35] See, e.g., *United States* v. *Teston*, Docket No. CR 22-1400 JB, 2024 WL 1621512, *20 (D.N.M. April 15, 2024) (acknowledging criticisms that "the 'in

opinion in *Bevis* v. *Naperville*, supra, 85 F.4th 1175, Circuit Judge Brennan asserted that common use is properly considered at step two because "the broader definition of [a]rms . . . should be read as [a]rms— not [a]rms in common use at the time. . . . The [Supreme] Court did not say that dangerous and unusual weapons are not *arms*. . . . [I]mporting the phrase in common use to assess whether firearms are [a]rms . . . improperly restricts the constitutional right. . . . [I]n common use is a sufficient condition for finding arms protected under the history and tradition test in *Bruen*, not a necessary condition to find them [a]rms." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 1209 (Brennan, J., dissenting). Judge Brennan further reasoned that the common use limitation is drawn "not . . . from a historical understanding of what an [a]rm is" but instead from "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (Internal quotation marks omitted.) Id.

We acknowledge that there is a logical argument to be made that the common use limitation is part of the state's burden at step two. Until the United States Supreme Court clarifies the *Bruen* test, however, our responsibility as a lower court is to apply the Supreme Court's precedent as we are best able to understand it. Our reading of that precedent dictates that the second amendment's "plain text" must not be considered in a vacuum. As the Supreme Court stated in *Bruen*, "the [s]econd [a]mendment's definition of 'arms' is fixed according to its historical understanding . . . ." *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 28. This is consistent with the idea "that the [s]econd [a]mendment . . . codified a pre-existing right" and that its "very text . . . implicitly recognizes

common use' question is, itself, rooted in historical inquiry—which makes step two of the *Bruen* analysis a better fit for its consideration").

the pre-existence of the right and declares only that it 'shall not be infringed.' " (Emphasis omitted.) *District of Columbia* v. *Heller*, supra, 554 U.S. 592; see also id., 599, 605 ("the [s]econd [a]mendment was not intended to lay down a novel principl[e] but rather codified a right inherited from our English ancestors" or, in other words, "codified venerable, widely understood liberties" (internal quotation marks omitted)). Consequently, the second amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]." (Internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 34; *District of Columbia* v. *Heller*, supra, 634–35. Therefore, although history has a principal role in *Bruen*'s second step, the Supreme Court instructs that "the historical understanding of the scope of the right"; *District of Columbia* v. *Heller*, supra, 625; also informs the meaning of the second amendment's text. That historical understanding, as the Supreme Court explained, was that the right was not an unlimited one "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"; *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 21; but, rather, that "the sorts of weapons protected were those in common use at the time"; id., 81 (Kavanaugh, J., concurring); and not those that were "dangerous and unusual"; (internal quotation marks omitted) id., 21; nor those "not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *District of Columbia* v. *Heller*, supra, 625.

Last, we also conclude that the common use analysis at *Bruen*'s first step incorporates both the "typical possession" and "dangerous and unusual" considerations. In *Heller*, the court used those three phrases together to define the limits on the types of "arms" to which the second amendment extends. See id., 624–27. Specifically, the court equated "in common use" with "typically

possessed" when it interpreted *Miller*'s discussion of the types of weapons that citizens were historically expected to bear when they appeared for militia service—namely, those "of the kind in common use at the time"—as saying "only that the [s]econd [a]mendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." (Internal quotation marks omitted.) Id., 624–25. The court confirmed that its interpretation of *Miller* was in "[accord] with the historical understanding of the scope of the right," which was that it "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" but, rather, was limited to weapons "in common use at the time," which, in turn, the court found "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (Internal quotation marks omitted.) Id., 626–27. Further, in its summary of that language in *Bruen*, the court juxtaposed weapons "in common use at the time" with "dangerous and unusual" weapons, suggesting that those phrases are opposite sides of the same coin: "[T]he [s]econd [a]mendment protects only the carrying of weapons that are those in common use at the time, as opposed to those that are highly unusual in society at large. . . . Whatever the likelihood that handguns were considered dangerous and unusual during the colonial period, they are indisputably in common use for self-defense today." (Citation omitted; internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 47. Thus, *Bruen* and *Heller* suggest that the "common use," "typical possession," and "dangerous and unusual" issues are inextricably intertwined when assessing whether a weapon is protected under the second amendment.[36] For that reason, we view all

---

[36] We acknowledge that *Heller* and *Bruen* do not explicitly state that the second amendment does not protect dangerous and unusual weapons but, rather, recognize only that there is a "historical tradition of prohibiting the carrying" of such weapons. *New York State Rifle & Pistol Assn., Inc.* v.

three of those phrases as bearing upon the common use inquiry at *Bruen*'s first step. Indeed, the considerations that other courts find relevant to whether a weapon is in common use often overlap with those that courts find relevant to whether a weapon is typically possessed by law-abiding citizens for lawful purposes or is dangerous and unusual. See, e.g., *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 85, 87 ("court [read] *Bruen* to abrogate *Cuomo* to the extent it treated common use" and "typical possession" as distinct inquiries, and noting that "there is a degree of overlap between the analyses for 'common use,' 'typical possession,' and 'dangerous and unusual' in the context of the [s]econd [a]mendment")).[37]

Therefore, we conclude that, on remand, the defendant bears the burden in the first instance to establish

*Bruen*, supra, 597 U.S. 21; *District of Columbia* v. *Heller*, supra, 554 U.S. 627. The Supreme Court, however, references that historical tradition only in an effort to define the types of weapons to which the second amendment extends. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 21; *District of Columbia* v. *Heller*, supra, 625. Accordingly, since before *Bruen*, courts, including our Supreme Court, have interpreted the "dangerous and unusual" language in *Heller* as creating an exception to second amendment protection for dangerous and unusual weapons. See *State* v. *DeCiccio*, supra, 315 Conn. 110 (*Heller* "held that [the second amendment] does protect the possession of weapons . . . typically possessed by law-abiding citizens for lawful purposes . . . and does not protect dangerous and unusual weapons" (citation omitted; internal quotation marks omitted)); *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 133, 202 A.3d 262 (2019) (noting in passing that *Heller* indicated that M-16s and related military grade weaponry can be banned because second amendment's protection does not extend to dangerous and unusual weapons), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*,     U.S.    , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

[37] See also *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 922 (determining whether firearm is " 'dangerous and unusual' " involves inquiry into whether it is "commonly possessed by law-abiding citizens for lawful purposes"); id. (considering "objective evidence regarding the ordinary self-defense needs of law-abiding citizens" in relation to both "dangerous and unusual" and "common use" inquiries); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 10, 11, 16 (D.D.C. 2023) (using phrase "typically possessed by law-abiding citizens for lawful purposes" interchangeably with "commonly used for self-defense"), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061); *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept.*

that the items at issue are arms in common use or typically possessed for lawful purposes like self-defense and, by implication, are not dangerous and unusual weapons. If he satisfies that burden, the state can then present evidence that the weapons are not, in fact, in common use or typically possessed for lawful purposes like self-defense, or are dangerous and unusual, and thus fall outside of the second amendment's scope. To be clear, the initial burden is on the party challenging the statute at issue to demonstrate that the second amendment presumptively protects the regulated weapon, and not on the state to prove that the weapon is not protected. In weighing the evidence presented by the parties, the court must decide whether the defendant has proved by a preponderance of evidence that the item at issue is (1) in fact an "arm" or an accessory that is necessary or essential to render a protected arm operable and (2) in common use or typically possessed for lawful purposes like self-defense.

3

Having concluded that the defendant bears the burden of proof on the common use issue, we now turn to what that inquiry might entail. The defendant argues that the relevant inquiry is only whether the arm is "typically possessed for lawful purposes," rather than whether it is commonly used—i.e., fired—for a lawful purpose. In other words, the defendant asserts that he can satisfy his burden simply by presenting statistical evidence that the firearms and firearm components at issue are commonly owned in this country. The defendant's counsel suggested at oral argument before this court, however, that the defendant may have to show that those items, in addition to being commonly owned, are "used in a lawful manner." Although, in his principal

*of Safety & Homeland Security*, 664 F. Supp. 3d 584, 591 (D. Del. 2023) ("[w]hether a weapon is 'in common use' depends on whether it is dangerous and unusual"), aff'd, 108 F.4th 194 (3d Cir. 2024).

appellate brief, the defendant does not clearly define the "lawful purpose" for which he asserts AR-15 style rifles and large capacity magazines are commonly used or owned,[38] he argues in his reply brief that those items are commonly used for self-defense. The defendant also asserts for the first time in his reply brief that "[h]unting rifles with semiautomatic action are ubiquitous," suggesting that hunting may be another lawful purpose for which semiautomatic rifles like an AR-15 style rifle are commonly used. As to silencers, the defendant argues that they "have legitimate uses in hunting, target shooting, and self-defense" because they protect the user's hearing. The defendant further argues, emphasizing the "conjunctive" nature of the "dangerous and unusual" inquiry, that a weapon cannot be considered "dangerous and unusual," and therefore outside of the second amendment's scope, if it is commonly owned. He also suggests, however, that it may be relevant to whether a weapon is dangerous and unusual to consider its "inherent risk" and use in crime.

The state asserts, on the other hand, that we should adopt the formulation of the common use inquiry applied in *National Assn. for Gun Rights* v. *Lamont,* supra, 685 F. Supp. 3d 63. In that case, the court asked whether the weapon at issue was commonly used for self-defense *and* typically possessed for that purpose or, instead, was dangerous *or* unusual, meaning that the weapon was used in a way that made it particularly dangerous or it was unusual for the weapon to be possessed for self-defense. See id., 90–91. Thus, according to the state, a weapon is protected by the second amendment only if it is both commonly used and typically

---

[38] For instance, the defendant asserts generally that both large capacity magazines and "[t]he semiautomatic rifles Connecticut defines as assault weapons are typically possessed by law-abiding citizens for lawful purposes . . . ." He also notes in passing that, although "[a] self-defense situation is . . . rare," large capacity magazines "are used for lawful self-defense purposes."

possessed *for self-defense* and is therefore neither unusual nor dangerous.

a

Initially, we seek to clarify the "lawful purpose" for which the items at issue must be "in common use." In *Heller*, the Supreme Court emphasized that individual self-defense is the "core lawful purpose" protected by the second amendment; *District of Columbia* v. *Heller*, supra, 554 U.S. 630; as well as "the *central component*" of the second amendment right; (emphasis in original) id., 599; a point that the court later reiterated in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 29. Nevertheless, the Supreme Court also stated in *Heller* that the second amendment protects weapons that are "typically possessed by law-abiding citizens for lawful purposes" generally. *District of Columbia* v. *Heller*, supra, 625.[39] Thus, we conclude that self-defense, although the core lawful purpose protected by the second amendment, is not necessarily the only lawful purpose that receives such protection.[40]

[39] Although *Bruen* focuses on self-defense and does not use the same "lawful purposes" language as *Heller*; see *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 32, 47 (undisputed that handguns were in common use for self-defense); we do not view *Bruen* as holding that self-defense is the sole lawful purpose protected by the second amendment. In *Bruen*, the court had no reason to discuss other lawful purposes because the parties argued that their proposed conduct involved self-defense. Id., 32. Moreover, the absence of such discussion from the court's opinion does not mean that *Heller*'s "lawful purposes" language is no longer relevant. Indeed, in *Bruen*, the court indicated that it was clarifying and applying *Heller*, not overruling it. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 31 ("[h]aving made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement").

[40] But see, e.g., *Bevis* v. *Naperville*, supra, 85 F.4th 1192 ("Both Supreme Court decisions and historical sources indicate that the [a]rms the [s]econd [a]mendment is talking about are weapons in common use for self-defense. That is not to say that there are no other lawful uses for weapons—sporting uses, collection, and competitions come to mind as examples. But the constitutional protection exists to protect the individual right to self-defense, and so that will be our focus."); *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 917 ("[T]here may be lawful purposes other than self-defense for which an individual can use a firearm . . . [such as hunting and sport

Hunting and target shooting, the additional lawful purposes suggested by the defendant, might qualify as other protected lawful purposes. Indeed, the Supreme Court explained that "[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important *for self-defense and hunting.*" (Emphasis added.) Id., 599; see also *Heller* v. *District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (interpreting *Heller*'s statement that individual self-defense is second amendment's "central component" as recognizing that "the [s]econd [a]mendment protects the right to keep and bear arms for other lawful purposes, such as hunting" (internal quotation marks omitted)). Furthermore, that target shooting for the purpose of training also may be a protected lawful purpose finds support in the court's conclusion that "the adjective 'well-regulated' [in the second amendment] implies . . . the imposition of proper discipline and training." *District of Columbia* v. *Heller*, supra, 554 U.S. 597; see also id., 618–19 (citing historical commentary stating that second amendment right "implies the learning to handle and use [arms]" and that "citizen[s] who . . . practi[c]e in safe places the use of [a gun or pistol], and in due time [teach] [their children] to do the same, [exercise] [their] individual right[s]" (internal quotation marks omitted)); *Oakland Tactical Supply, LLC* v. *Howell Township*, 103 F.4th 1186, 1197 (6th Cir. 2024) ("the [s]econd [a]mendment protects the right to engage in . . . firearms training as necessary to protect the right to effectively bear arms in case of confrontation" (footnote omitted)), petition for cert. filed (U.S. August

or target shooting]. . . . While these uses may be lawful, they have never been explicitly recognized as being the *central component* of the [s]econd [a]mendment right; only self-defense enjoys that kind of unique focus within the Supreme Court's caselaw. . . . Accordingly, this [c]ourt finds that the [s]econd [a]mendment protects an individual right to commonly used firearms for the central purpose of self-defense." (Citations omitted; emphasis in original; internal quotation marks omitted.)).

20, 2024) (No. 24-178).[41] At least one court, however, has called into question whether hunting and other recreational uses of arms are protected by the second amendment. See, e.g., *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 917 ("[h]unting and other recreational uses of guns have no explicit or otherwise direct protection in the text of the [c]onstitution or under existing doctrine, nor does the historical evidence support such a conclusion" (internal quotation marks omitted)). In the present cases, neither party has fully addressed, either before the trial court or this court, what lawful purposes are protected by the second amendment. Thus, to the extent that the defendant seeks to argue on remand that AR-15 style rifles, large capacity magazines, and silencers are in common use for a lawful purpose other than self-defense, we leave it to the trial court to decide, on the basis of the record developed by the parties, whether the proposed lawful purpose is one protected by the second amendment.

b

We now consider how the trial court is to assess whether a weapon is in common use today for lawful purposes. Although the Supreme Court made clear in *Bruen* that "the [s]econd [a]mendment protects the possession and use of weapons that are in common use at the time"; (internal quotation marks omitted) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 21; it did not set forth any sort of analytical framework for evaluating whether a weapon satisfies that criteria. Because it was undisputed in *Bruen* "that handguns are weapons in common use today for self-defense," it was unnecessary for the court to analyze the issue. (Internal quotation marks omitted.) Id., 32. In an effort to provide guidance to the trial court and the parties, we briefly discuss evidence other courts

---

[41] See also *Friedman* v. *Highland Park*, 577 U.S. 1039, 1039, 136 S. Ct. 447, 193 L. Ed. 2d 483 (2015) (Thomas, J., dissenting from denial of certiorari) (noting that "many Americans own [modern sporting rifles (e.g., AR-style

have considered when assessing whether a weapon is commonly used or typically possessed today for lawful purposes or whether the weapon is, by contrast, dangerous and unusual. We do not endeavor to define precisely all of the evidence that the court should consider or how it should weigh such evidence; rather, we simply observe that there are several considerations that may inform a court's analysis of those issues.[42]

First, to address the defendant's argument on statistical numerosity, by contrasting weapons "in common

semiautomatic rifles)] for lawful purposes like self-defense, hunting, and target shooting").

[42] Given our conclusion that the "dangerous and unusual" issue is encompassed within the "common use" inquiry rather than is itself a distinct inquiry, we do not find it necessary to separately define "dangerous and unusual." We do find it necessary, however, to address the state's argument that the proper formulation of the phrase is "dangerous *or* unusual." The state relies on *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 90, in which the court rejected that "dangerous and unusual" was a conjunctive test because "*Heller*'s use of [that] phrase . . . does not state that it must be conjunctive, but instead cites to several sources . . . [that] use the phrase 'dangerous or unusual weapons' . . . ." (Citations omitted; emphasis omitted.) We are not persuaded.

In *Bruen*, the Supreme Court carefully used the phrase "dangerous and unusual" five times to describe the tradition of prohibiting the carrying of dangerous and unusual weapons, and it used the phrase "dangerous or unusual" only once when quoting from the brief submitted by the government's amici. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 21, 46–47, 51; see also *Caetano* v. *Massachusetts*, 577 U.S. 411, 417–18, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (Alito, J., concurring in the judgment) (Whether a weapon is dangerous and unusual "is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. . . . [T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. . . . If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." (Citations omitted; emphasis omitted; internal quotation marks omitted.)). Thus, the Supreme Court has made it fairly clear that a weapon does not fall outside of the second amendment's scope merely because it is relatively dangerous. We reiterate that the "common use" inquiry asks whether the weapons are commonly used or typically possessed for lawful purposes like self-defense. Accordingly, to the extent that the state seeks to demonstrate on remand that the weapons at issue are dangerous, evidence of the weapon's dangerousness informs the "common use" inquiry only insofar as it tends to show that the weapon is not in fact commonly used or owned by American citizens for such lawful purposes.

use at the time" with "those that are highly unusual in society at large"; (internal quotation marks omitted) id., 47; *Bruen* suggests that statistics on possession, ownership, or circulation of the weapon at issue, "when contextualized by a denominator"; *Rupp* v. *Bonta*, Docket No. 8:17-cv-00746-JLS-JDE, 2024 WL 1142061, *18 (C.D. Cal. March 15, 2024), appeal filed (9th Cir. April 24, 2024) (No. 24-2583); may indeed be one relevant consideration. For example, the United States District Court for the District of New Jersey, in concluding that the plaintiff had proved that AR-15s were in common use for lawful purposes, relied on evidence that "AR-15 firearms are produced by a multitude of manufacturers and are commonly owned throughout the United States—it is estimated that as of 2022, AR-15s and similar sporting rifles had around 24 million owners; this ownership number was exceeded only by the number of registered handgun owners within our [n]ation. As of 2022, it was estimated that there were around 24 million AR-15s and similar sports weapons in circulation; this number was exceeded only by the number of registered handgun owners within the United States." (Footnote omitted.) *Assn. of New Jersey Rifle & Pistol Clubs, Inc.* v. *Platkin*, Docket Nos. 18-10507-PGS-JBD, 22-04360-PGS-JBD and 22-04397-PGS-JBD, 2024 WL 3585580, *18 (D.N.J. July 30, 2024), appeal filed sub nom. *Assn. of New Jersey Rifle & Pistol Clubs, Inc.* v. *Attorney General* (3d Cir. August 6, 2024) (No. 24-2415), and appeal filed sub nom. *Assn. of New Jersey Rifle & Pistol Clubs, Inc.* v. *Attorney General* (3d Cir. August 9, 2024) (No. 24-2450). We nevertheless agree with the courts that have concluded that such statistics are not dispositive.[43] Because, as we have already stated in this opinion, the full inquiry is whether the weapon is in common use today "*for lawful purposes* like self-defense"; (emphasis added) *District of Columbia* v.

___

[43] See, e.g., *Vermont Federation of Sportsmen's Clubs* v. *Birmingham*, Docket No. 2:23-CV-710, 2024 WL 3466482, *8 (D. Vt. July 18, 2024) (" 'common ownership' is different from 'common use for self-defense,' which is

*Heller*, supra, 554 U.S. 624; see also *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 47 (handguns "are indisputably in common use *for self-defense* today" (emphasis added; internal quotation marks omitted)); the court must also consider how and why a particular weapon is used. See, e.g., *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 87–88 ("the three phrases—common use, typical possession, and dangerous and unusual—[are] meant to get at both . . . how and why the firearms are commonly used and possessed, whether it be for self-defense or for some unlawful end");[44] see also *Oregon*

what *Bruen* mandates"), appeal filed, 2024 WL 3466482 (2d Cir. July 31, 2024) (No. 24-2026); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 86–87 (noting circularity concerns with "solely statistical" inquiry and that relevant inquiry is "whether the weapons are in common use today *for self-defense*" (emphasis in original; internal quotation marks omitted)); *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 11 (D.D.C. 2023) ("Whether [large capacity magazines] are in common use is merely the beginning of the analysis. The full inquiry is whether the prohibited weapons are typically possessed . . . for lawful purposes." (Emphasis omitted; internal quotation marks omitted.)), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061).

But see, e.g., *United States* v. *Mitchell*, Docket No. 1:24-cr-9, 2024 WL 2272275, *3 (N.D. Ohio May 20, 2024) (viewing "common use" as purely statistical inquiry and finding that, "[a]lthough the number of civilian-owned machineguns has increased to about 740,000, this amount—which is less than .2 [percent] of total firearms in the United States—remains too insignificant for machineguns to be considered in common use" (internal quotation marks omitted)); *Mock* v. *Garland*, 697 F. Supp. 3d 564, 581 (N.D. Tex. 2023) ("[t]he relevant inquiry under this standard is the current total number of a particular weapon that is in lawful possession, ownership, and circulation throughout the United States"), appeals dismissed sub nom. *Watterson* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, Docket Nos. 23-40556, 23-11157, 23-11199, 23-11203, 23-11204 and 23-40685, 2024 WL 3935446 (5th Cir. August 26, 2024); *United States* v. *Lane*, supra, 689 F. Supp. 3d 251 ("the question of whether machineguns are 'unusual' can be answered by simply comparing the number of the machineguns in this country to the total number of guns overall").

[44] We note that, although our proposed analysis is similar, we do not adopt the same analytical framework that the court applied in *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 63. We are persuaded by certain aspects of the court's analysis in that case but remain unconvinced by others. In particular, we do not agree that "a weapon must be both possessed for the purpose of *and* actually used for self-defense in order to fall within the [s]econd [a]mendment's protection . . . ." (Emphasis added.) Id., 90–91. As discussed further in this opinion, although how a weapon is used is relevant to the analysis, we do not believe that it is necessary that

*Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 916 (common use is not dispositive of inquiry but must be considered in conjunction with how firearm or firearm accessory is used).

Several considerations may inform a court's inquiry into how and why a weapon is used. For example, a court may find it relevant to assess how frequently the weapon is in fact used for lawful purposes like self-defense. See, e.g., *Hanson* v. *District of Columbia*, 671 F. Supp. 3d 1, 14, 16 (D.D.C. 2023) (magazines with capacity of more than ten rounds are "not in fact commonly used for self-defense" because civilians fire average of 2.2 shots in self-defense incidents), appeal filed (D.C. Cir. May 17, 2023) (No. 23-7061). A court may weigh that evidence against other evidence tending to show that the weapon is instead disproportionately used for unlawful purposes. See, e.g., *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 99 (although "mindful of the fact that the commonality of a particular firearm or weapon's use in crime was not enough to find in either *Heller* or *Cuomo* that the firearms at issue were not typically used for law-abiding purposes," and thus not treating such evidence as dispositive, court found that evidence as to suitability of assault weapons for crime outweighed limited evidence presented on their use for self-defense); *Oregon Firearms Federation, Inc.* v. *Brown*, 644 F. Supp. 3d 782, 801 (D. Or. 2022) (large capacity magazines are not in common use for lawful purposes like self-defense because, while "rarely used by civilians for self-defense," they are "disproportionately used in crimes involving mass shootings"), appeal dismissed, Docket No. 22-36011, 2022 WL 18956023 (9th Cir. December 12, 2022).

Additionally, a court may find it relevant to consider whether the firearm is predominantly used by the mili-

a weapon is frequently fired or deployed to receive second amendment protection.

tary or law enforcement;[45] has features that make it more suitable for self-defense,[46] perhaps as opposed to military purposes;[47] or has features that resemble those of a military grade weapon or are distinguishable from those of a handgun,[48] the latter of which the United

[45] See, e.g., *Oregon Firearms Federation, Inc.* v. *Brown*, supra, 644 F. Supp. 3d 801 (large capacity magazines are not in common use for lawful purposes like self-defense because, while "rarely used by civilians for self-defense, [large capacity magazines] are often used in law enforcement and military situations").

[46] See, e.g., *Assn. of New Jersey Rifle & Pistol Clubs, Inc.* v. *Platkin*, supra, 2024 WL 3585580, *18 ("[T]he build of the AR-15 makes it well-suited to self-defense because it is light weight, [has] very mild recoil, and [has] good ergonomics . . . [and] it is a weapon which is well suited to younger shooters, female shooters, and other shooters of smaller stature . . . . Further, the AR-15's design features—including the effectiveness of its cartridge for self-defense use and its better continuity of fire when used with available magazines—make the AR-15 a good choice for self-defense." (Citation omitted; internal quotation marks omitted.)).

[47] See, e.g., *United States* v. *Alsenat*, Docket No. 0:23-cr-60209-Leibowitz, 2024 WL 2270209, *6 (S.D. Fla. May 20, 2024) (although not deciding whether "unusual" involves determining whether weapon is common in society or its essential purpose is self-defense, court concluded that "machineguns are unusual . . . [because they] are both absolutely and relatively uncommon in the United States [and] . . . are unsuitable as a weapon for self-defense" (internal quotation marks omitted)); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 103 (evidence in record that "assault weapons and [large capacity magazines] are more suitable for military use than civilian self-defense . . . support[ed] [the court's] conclusion that the militaristic character of assault weapons weighs in favor of finding that they are not typically possessed by the average citizen for self-defense"); *Hanson* v. *District of Columbia*, supra, 671 F. Supp. 3d 11–14 (considering whether benefits of large capacity magazines are "most useful in military service"); *Oregon Firearms Federation, Inc.* v. *Brown*, supra, 644 F. Supp. 3d 801 (observing that large capacity magazines are "particularly designed and most suitable for military and law enforcement applications rather than the core [s]econd [a]mendment right of self-defense" (internal quotation marks omitted)). But see *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept. of Safety & Homeland Security*, 664 F. Supp. 3d 584, 594 (D. Del. 2023) ("the relevant question . . . is 'what the people choose' for lawful purposes, rather than a weapon's objective suitability for those purposes"), aff'd, 108 F.4th 194 (3d Cir. 2024); see also *District of Columbia* v. *Heller*, supra, 554 U.S. 629 ("[*w*]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home" (emphasis added)).

[48] See, e.g., *Bevis* v. *Naperville*, supra, 85 F.4th 1195 (AR-15s and large capacity magazines "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are

States Supreme Court has deemed "the quintessential self-defense weapon." *District of Columbia* v. *Heller*, supra, 554 U.S. 629. For example, in *Bevis* v. *Naperville*, supra, 85 F.4th 1197, the Seventh Circuit focused its inquiry at *Bruen*'s first step regarding whether the weapons at issue "[fell] on the military or civilian side of the line." The court explained that "what distinguishes AR-15s from M-16s . . . is important precisely because *Heller* itself stated that [M-16s] are not among the [a]rms covered by the [s]econd [a]mendment; they are instead a military weapon." Id., 1195. On the basis of the limited evidence presented during proceedings on the plaintiffs' motion for a preliminary injunction, the court in *Bevis* concluded that AR-15s and large capacity magazines "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude). Indeed, the AR-15 is almost the same gun as the [M-16] . . . . The only meaningful distinction (unless the user takes advantage of some simple modifications that essentially make it fully automatic) is that the AR-15 has only semiautomatic capability . . . while the [M-16] operates both ways. Both weapons share the same core design, and both rely on the same patented operating system." (Footnote omitted.) Id., 1195–96; see also footnote 30 of this opinion. The court also compared the firing rates of the AR-15 and M-16 but noted that "[b]etter data on firing rates might change the analysis . . . ." *Bevis* v. *Naperville*, supra, 1197. Given that "this [was] just a preliminary look at the subject," however, the court did "not rule out the possibility that

used for individual self-defense (or so the legislature was entitled to conclude)"); see also *State* v. *DeCiccio*, supra, 315 Conn. 122, 133 (in assessing whether dirk knives and police batons are "dangerous and unusual weapons," court relied on, inter alia, findings that police batons and dirk knives were "inherently less lethal" or had "more limited lethality relative" to handguns).

the plaintiffs [would] find other evidence that shows a sharper distinction between AR-15s and [M-16s] . . . than the . . . record reveal[ed]." Id.

The defendant rejects, as unsupported by *Bruen*, *McDonald*, or *Heller*, the line that the court in *Bevis* drew between military and civilian weapons. We do not agree that such a distinction has no basis in the Supreme Court's precedent. Assessing a firearm's militaristic character as part of the common use inquiry finds support in *Heller*'s indication that weapons that are "most useful in military service—M-16 rifles and the like"— are not the types of weapons typically possessed by law-abiding citizens for lawful purposes. *District of Columbia* v. *Heller*, supra, 554 U.S. 627. Similar to the court in *Bevis*, we view *Heller*'s recognition of the handgun as "the quintessential self-defense weapon"; id., 629; and suggestion that military grade weapons like M-16s are not protected arms; see id., 624–25, 627; as establishing two "arms" at opposite ends of a spectrum. As the court in *Bevis* explained, determining "the types of '[a]rms' that are covered by the [s]econd [a]mendment . . . presents a line-drawing problem. Everyone can agree that a personal handgun, used for self-defense, is one of those [a]rms that law-abiding citizens must be free to 'keep and bear.' Everyone can also agree, we hope, that a nuclear weapon such as the now-retired M388 Davy Crockett system, with its 51-pound W54 warhead, can be reserved for the military . . . . Many weapons, however, lie between these extremes." (Footnotes omitted.) *Bevis* v. *Naperville*, supra, 85 F.4th 1182–83. The common use inquiry aims to determine exactly where the weapons at issue fall on that spectrum.

The defendant also argues that common use does not require "the actual firing of a weapon" because, if it did, "the *Heller* court would have looked at statistical

averages about how often handguns were fired for self-defense. The statistic was never mentioned." (Internal quotation marks omitted.) In support of this position, the defendant cites two pre-*Bruen* cases that applied *Heller*. See footnote 8 of this opinion. First, the defendant cites Justice Alito's concurring opinion in *Caetano* v. *Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016), in which the United States Supreme Court vacated the lower court's judgment and remanded the case to that court because it had failed to properly apply *Heller* to a challenge to a Massachusetts prohibition on the possession of stun guns. The defendant asserts that, in considering "whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today"; (emphasis omitted) id., 420 (Alito, J., concurring in the judgment); Justice Alito considered only the number of Tasers and stun guns that were sold to private citizens, not how often those weapons were used. Id. Second, the defendant asserts that, in *State* v. *DeCiccio*, supra, 315 Conn. 108, in which our Supreme Court considered whether dirk knives and police batons are "arms" for purposes of the second amendment, the court did not "consider how often [those weapons] were used for self-defense . . . . Instead, it concluded that both are typically possessed by law-abiding citizens for lawful purposes."

We agree with the defendant that a firearm does not have to be fired regularly to constitute a weapon in common use for lawful purposes like self-defense. As the defendant argues, a firearm can be " 'used' " for self-defense even if it is never actually fired. See, e.g., *Duncan* v. *Bonta*, supra, 695 F. Supp. 3d 1227 ("[A] firearm kept on one's nightstand is used for self-defense even when the night is quiet. It is kept and used in case of confrontation. A person may happily live a lifetime without needing to fire their gun in self-defense. But that is not to say that such a person does not use their

gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired." (Emphasis omitted.)); *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 921 ("[A]n individual need not fire a gun to use it for self-defense. . . . [I]n brandishing a firearm to intimidate an attacker, for instance, the individual uses the firearm for self-defense." (Footnote omitted.)). To be sure, the Supreme Court focused on the handgun being "the most popular weapon *chosen* by Americans for self-defense in the home," rather than whether it was in fact commonly deployed for that lawful purpose. (Emphasis added; internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 22; see also *District of Columbia* v. *Heller*, supra, 554 U.S. 629 (same). Moreover, in *Heller*, the court did not limit the second amendment right to only "using" or "carrying" weapons but, instead, stated that the ordinary meaning of the phrase "keep [a]rms" in the second amendment is "have weapons." (Internal quotation marks omitted.) *District of Columbia* v. *Heller*, supra, 582; id., 583 (" '[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else" (emphasis omitted)). Accordingly, we do not view the common use limitation as requiring the actual use of a weapon. Therefore, a court may find it relevant to *Bruen*'s threshold inquiry to consider, in addition to or in place of evidence of how frequently a firearm is actually fired, evidence that demonstrates that a weapon is typically possessed or owned for lawful purposes, including, but not limited to, gun owners' subjective reasons for owning the firearm at issue in conjunction with rates of gun ownership.[49]

---

[49] Compare *Delaware State Sportsmen's Assn., Inc.* v. *Delaware Dept. of Safety & Homeland Security*, 664 F. Supp. 3d 584, 594–96 (D. Del. 2023) (considering statistics on ownership and circulation of AR-15s and consumer report showing reasons gun owners seek to own AR-15s but declining to consider actual use statistics), aff'd, 108 F.4th 194 (3d Cir. 2024), with *Oregon Firearms Federation* v. *Kotek*, supra, 682 F. Supp. 3d 897, 918 (stating that "an individual's subjective intent in purchasing a firearm or firearm

Nonetheless, neither Justice Alito's concurring opinion in *Caetano*, aside from the fact that it is not binding on this court, nor our Supreme Court's decision in *DeCiccio* suggest that how frequently a weapon is actually deployed for lawful purposes is irrelevant to the common use inquiry. Indeed, just as evidence that a weapon is commonly owned or kept in the home for the purpose of self-defense may inform a court's assessment of whether Americans commonly choose a given weapon for lawful purposes, so too may evidence of how often Americans actually deploy that weapon for such purposes be relevant to that question. See *Vermont Federation of Sportsmen's Clubs* v. *Birmingham,* Docket No. 2:23-cv-710, 2024 WL 2150522, *2 n.5 (D. Vt. May 14, 2024) (although relevant question may be "what weapons are *chosen* [by] Americans for self-defense, not what weapons are *deployed or fired* in self-defense . . . the frequency at which weapons are fired in self-defense is still relevant to the question of which weapons are used in self-defense" (citation omitted; emphasis in original; internal quotation marks omitted)), appeal filed, 2024 WL 3466482 (2d Cir. July 31, 2024) (No. 24-2026). To the extent that the defendant argues that the former type of evidence is entitled to greater weight than the latter, "[i]t is the exclusive province of the [trial court on remand] to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a

accessory for self-defense, while relevant, also cannot be dispositive in assessing whether a firearm or firearm accessory is in common use for self-defense" and concluding that large capacity magazines are not commonly used for self-defense because, although "many Americans purchase [them] with the intent to use them for self-defense . . . it is exceedingly rare . . . for an individual to fire more than ten shots in self-defense"), and *National Assn. for Gun Rights* v. *Lamont,* supra, 685 F. Supp. 3d 87–88 (asking whether "law-abiding citizens *buy the weapons at issue for the purpose of defending themselves,* or because the weapons' characteristics are well-suited for some unlawful purpose," and, once purchased, whether those firearms are "*actually used* for self-defense, or are . . . more often utilized to achieve unlawful ends" (emphasis added)).

witness' testimony." (Internal quotation marks omitted.) *Delena* v. *Grachitorena*, 216 Conn. App. 225, 231, 283 A.3d 1090 (2022); see also *Vermont Federation of Sportsmen's Clubs* v. *Birmingham*, supra, *2 n.5 ("[p]laintiffs may seek to admit [evidence] on how frequently individuals keep [large capacity magazines] for self-defense, or the magnitude of their deterrent effect . . . but relevance of other considerations to the ultimate inquiry creates a question of weight, not relevance" (citation omitted; emphasis omitted; internal quotation marks omitted)).

In sum, courts have considered a number of factors to determine whether the weapons at issue were in common use for lawful purposes like self-defense, which factors tend to show both "how" and "why" a particular weapon is used or possessed, including, but not limited to, evidence demonstrating whether American citizens typically possess, or own, the weapon and the subjective reasons for such ownership. We agree that such evidence can be helpful in making the factual determination as to whether the weapon is in common use for a lawful purpose. At the same time, we do not believe that this constitutes an exhaustive list of the factors that the court can consider; nor is any combination of these factors dispositive of the common use question. Ultimately, it is the function of the trial court on remand, applying the rules of evidence, to decide whether the evidence presented by the parties is relevant to the common use inquiry and to credit the evidence that it finds most persuasive.

The defendant's burden on remand, then, is to demonstrate as a threshold matter that (1) the silencers and large capacity magazines that he possessed are "arms" as *Heller* defined that term or, alternatively, are necessary or essential to use a constitutionally protected firearm, and (2) the silencers, large capacity magazines, and AR-15 style rifles that he possessed or sold are in

common use or typically possessed today for lawful purposes. The state may then present evidence to rebut that showing. The court must weigh the evidence presented by the parties to determine whether it weighs in favor of second amendment protection. If the court concludes at step one that the second amendment does not apply, the analysis ends there. Alternatively, if the court concludes that any of the firearms or related components at issue are "arms" in common use or typically possessed for lawful purposes, then the second amendment presumptively protects those items, and the court must proceed to *Bruen*'s second step, to which we now turn briefly.

B

As clearly set forth in *Bruen*, if the second amendment presumptively protects the defendant's conduct, the burden then shifts to the state to demonstrate that its regulation of that conduct "is consistent with the [n]ation's historical tradition of firearm regulation." *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 24. On remand, the parties will have an opportunity to develop the historical record for the purpose of collecting historical analogues to the challenged statutes. In assessing these analogues, the court must consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," or, in other words, "is relevantly similar to laws that our tradition is understood to permit . . . ." (Internal quotation marks omitted.) *United States* v. *Rahimi*, supra, 144 S. Ct. 1898. Central to that inquiry is "how and why the regulations burden a law-abiding citizen's right to armed self-defense"; that is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified . . . ." *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 29. If the court is satisfied that the state has

carried its burden, it must uphold the regulation as constitutional.[50]

The parties do not dispute the nature of the inquiry at *Bruen*'s second step to the same extent that they dispute the nature of the step one inquiry. We find it necessary, however, to briefly address two of the defendant's arguments about the minimal historical analysis that the state sets forth in its appellate brief. We will address each argument in turn.

First, the defendant argues that the state cannot carry its burden by presenting historical regulations of non-firearm weapons such as knives. We do not read *Bruen*'s test so rigidly. The Supreme Court emphasized in *Bruen* that the state must only "identify a well-established and representative historical *analogue*" to a modern-day regulation, not "a historical *twin*" or "a dead ringer . . . ." (Emphasis in original.) Id., 30. As the court recently reiterated in *Rahimi*, "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster." (Internal quotation marks omitted.) *United States* v. *Rahimi*, supra, 144 S. Ct. 1898. Indeed, in *Bruen*, the Supreme Court suggested that a historical regulation of nonfirearm weapons may be a sufficiently comparable analogue to a modern firearm regulation.

---

[50] Although we have greatly simplified our explanation of *Bruen*'s second step, we acknowledge that the practical application of the history and tradition test is not, by any means, a simple task for a trial court. We echo Justice Jackson's sentiment, expressed in her concurring opinion in *Rahimi*, that "courts, which are currently at sea when it comes to evaluating firearms legislation, need a solid anchor for grounding their constitutional pronouncements." *United States* v. *Rahimi*, supra, 144 S. Ct. 1930. Until the United States Supreme Court issues clearer guidance on how to conduct *Bruen*'s test, however, it is our job, and the job of the trial court, to apply that test as we are best able to understand it. We do not underestimate the difficult burden confronting the trial court on remand. And, although we do not expect that we have addressed in this opinion every issue that will arise on remand, we hope that our guidance eases at least some of the heavy burden the *Bruen* test imposes.

See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 40–42. Specifically, the court concluded that a medieval English statute prohibiting "rid[ing] or go[ing] . . . armed" was "not sufficiently probative to defend New York's proper-cause requirement." (Internal quotation marks omitted.) Id., 40. Aside from the fact that the statute was enacted more than 450 years before the constitution's ratification and thus "ha[d] little bearing on the [s]econd [a]mendment," the court reasoned that the medieval prohibition appeared to "focus on armor and, perhaps, weapons like launcegays," both of which, unlike handguns, "were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace." Id., 41. The court noted that the government had presented "no evidence suggesting the [medieval] [s]tatute applied to the smaller medieval weapons"—namely, a knife or dagger, which almost everyone during medieval times carried in their belts and were often worn by civilians for self-protection—"that str[uck] [the court] as most analogous to modern handguns," which were not in existence during the medieval period. Id., 41–42. Thus, the court implied that, if the historical regulation had applied to the types of medieval weapons that the court viewed as "most analogous to modern handguns," it may have been a more persuasive historical analogue for the modern-day handgun regulation. Id., 42.

Accordingly, to prevail on remand, it is not necessary for the state to present a "historical twin" that regulates the same type of weapon as does the challenged regulation. The central considerations, rather, are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified . . . ." Id., 29. If a court concludes that a historical knife regulation and a modern firearm regulation comparably burden that right, and that the burden is comparably justified, then

that historical regulation may be sufficiently analogous to the modern regulation to pass *Bruen*'s test. Indeed, if the regulated firearm was not in existence at the time of the second amendment's ratification, resorting to historical analogues of nonfirearm weapons may be the only way in which the state can satisfy its burden.

Second, the defendant claims that the state's arguments about technological developments and using a " 'nuanced approach' " to analytical reasoning in effect ask this court to adopt the type of means-end scrutiny that *Bruen* prohibits. We disagree. To be sure, other courts have recognized that *Bruen*'s instruction to look for a historical analogue that imposes a comparable burden that is comparably justified in relation to the challenged regulation resembles a means-end balancing test despite the court's express rejection of such means-end balancing in the second amendment context. See, e.g., *Bevis* v. *Naperville*, supra, 85 F.4th 1199 ("[f]or all its disclaiming of balancing approaches, *Bruen* appears to call for just that: a broader restriction burdens the [s]econd [a]mendment right more, and thus requires a closer analogical fit between the modern regulation and traditional ones; a narrower restriction with less impact on the constitutional right might survive with a looser fit"). Nevertheless, the Supreme Court expressly provided for "a more nuanced approach" for cases that, unlike *Bruen* and *Heller*, do not involve analogies that are "relatively simple to draw" but, rather, "implicat[e] unprecedented societal concerns or dramatic technological changes . . . ." *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 27. The court cautioned, however, that "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. . . . Analogical reasoning requires judges to apply faithfully the balance

struck by the founding generation to modern circumstances . . . . It is not an invitation to revise that balance through means-end scrutiny." (Citations omitted.) Id., 29 n.7.

Finally, we note that, although "common use," "typical possession," and "dangerous and unusual" must be addressed at *Bruen*'s first step, they also may be relevant to *Bruen*'s second step for the purposes of identifying historical analogues that impose a comparable burden on the second amendment right and are comparably justified. For instance, even if a weapon is "in common use," a court may nonetheless consider the unusually dangerous character of a weapon, or its militaristic features, at *Bruen*'s second step. Although the United States Supreme Court recognized a historical tradition of prohibiting the carrying of dangerous *and* unusual weapons, neither *Bruen* nor *Heller* precludes the state from meeting its burden by demonstrating through historical analogues that this country also has a historical tradition of regulating particularly dangerous weapons or of reserving certain weapons for military or law enforcement use. See, e.g., *Bevis* v. *Naperville*, supra, 85 F.4th 1199, 1201 (considering common use at both steps of analysis without deciding where it belongs, and concluding at step two that there are longstanding traditions of regulating especially dangerous weapons and of distinguishing between military or law enforcement access to and civilian ownership of such weapons); *National Assn. for Gun Rights* v. *Lamont*, supra, 685 F. Supp. 3d 90 n.11 ("even if a weapon must be dangerous and unusual to fall under the already enumerated [s]econd [a]mendment exception from *Heller*," as opposed to dangerous *or* unusual, "it is consistent with the nation's tradition and history of firearm regulation to regulate narrow and specific categories of unusually dangerous weapons resulting from developments in firearm technology" (emphasis omitted)).

Additionally, to satisfy its burden of identifying a historical analogue that imposes a comparable burden on the right to keep and bear arms, it may be necessary to assess whether the historically regulated arms were, like the modern regulated arms, in common use for lawful purposes at the time of the historical regulation. See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 42 (rejecting historical analogue where there was no evidence that it applied to "the smaller medieval weapons that str[uck] [the court] as most analogous to modern handguns").

The judgments are reversed and the cases are remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.